Barry I. Levy, Esq.
Michael Vanunu, Esq.
Garin Scollan, Esq.
Alexandra Wolff, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                              Plaintiffs,

           -against-

VLADISLAV STOYANOVSKY, GARY GRODY a/k/a
LANCE GRODY, HEADLAM MEDICAL PROFESSIONAL
CORPORATION, ERIC MELADZE, BLUE TECH
SUPPLIES INC., SUNSTONE SERVICES INC., and JOHN
DOE DEFENDANTS "1" through "10",

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.:_____ (        )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

      Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Vladislav Stoyanovsky

("Stoyanovsky"), Gary Grody a/k/a "Lance" Grody ("Grody"), Headlam Medical Professional

Corporation ("HMPC"), Eric Meladze ("Meladze"), Blue Tech Supplies Inc. ("Blue Tech"),

Sunstone Services Inc. ("Sunstone") and John Doe Defendants "1" through "10" (the "John Doe Defendants") (collectively referred to hereinafter as the "Defendants") hereby allege as follows:

## NATURE OF THE ACTION

1.     GEICO brings this action to recover more than $1 million that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services styled as extracorporeal shockwave therapy ("ESWT") (hereinafter, the "Fraudulent Services") and allegedly provided to New York automobile accident victims who were insured by GEICO ("Insureds").  The fraudulent scheme was committed by the Defendants, none of whom are licensed healthcare professionals, by misappropriating the name, medical license, signature, and other information of a physician by the name of Bo Tyler Headlam, M.D. ("Headlam") and a medical professional corporation that was in Headlam's name, HMPC, and unlawfully using that professional corporation to bill for the Fraudulent Services.

2.     As discussed in more detail below, the claims submitted to GEICO seeking payment for the Fraudulent Services were never reimbursable, and the Defendants at all relevant times knew that:

> (i)     the Fraudulent Services were allegedly provided by and billed through HMPC, which was a medical "practice" not under the control and direction of Headlam, but rather, at all relevant times operated, managed, and controlled by Stoyanovsky Grody, and the John Doe Defendants the "Management Defendants"), for purpose of effectuating large-scale insurance fraud schemes on GEICO and other New York automobile insurers;

> (ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions made by licensed healthcare providers, and as a result of illegal financial arrangements established between the Management Defendants and the Clinics (as defined below);

(iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv) the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

(v) the Fraudulent Services, to the extent provided at all, were not provided by Headlam or any other licensed physician, but by persons who were unlicensed, and were neither directly supervised by Headlam nor employed by Headlam or HMPC.

3. The fraudulent scheme has its origin with the Management Defendants, who are all unlicensed, non-professionals. At all relevant times, they were involved in the design and implementation of the fraudulent scheme, and secretly and unlawfully operated, managed, and controlled HMPC.

4. The Management Defendants misappropriated and illegally used Headlam's name, medical license, signature, and other information, as well as the name and tax identification number of HMPC, to implement the fraudulent scheme. HMPC was used to bill and collect insurance payments from GEICO and other New York automobile insurers. As a result of the fraudulent scheme, GEICO alone was billed more than $1.1 million in the name of HMPC for the alleged performance of the Fraudulent Services.

5. The billing submitted to GEICO represented that the Fraudulent Services were performed at numerous individual locations starting in September of 2021. Hundreds of individual claim submissions were made to GEICO seeking payment of no-fault benefits for the Fraudulent Services, all of which represented that Headlam legitimately owned and controlled HMPC, and that Headlam allegedly performed the Fraudulent Services. In truth, Headlam performed none of the Fraudulent Services and did not legitimately operate, manage, or control HMPC.

6.      Prior to September 2021, Headlam had billed GEICO in the name of HMPC for healthcare services provided to Insureds, but which were markedly different, and never included ESWT.   HMPC's billing had been sporadic through the years, with the last billing prior to the commencement of the fraudulent scheme being in May 2020.

7.      In the fall of 2021, the Defendants engineered the fraudulent scheme involving the illegal use of Headlam's medical license and HMPC's name on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things: (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement; (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule; and (iii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

8.      In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which had historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established.

9.      Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – the service required considerable

investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

10.     The Defendants seized on these changes in the Fee Schedule (or lack thereof), and the fraudulent scheme and the unlawful scheme involving the use of Headlam's name, medical license, signature, and other information was launched.

11.     Defendants put the fraudulent scheme into motion: (i) having previously used the information of several physicians to implement similar transient ESWT fraudulent schemes in New York; and (ii) knowing that Headlam was a vulnerable target, because Headlam: (a) was in significant financial debt – evidenced through the fact that Headlam filed for Chapter 7 Bankruptcy on July 13, 2017, in the United States District Court in the Southern District of New York; and (b) was highly motivated to protect their medical license.

12.     Based on Headlam's financial issues, the Management Defendants knew they could acquire and misappropriate Headlam's information if Headlam was convinced they could be hired for a "supervisory" position in exchange for the payment of money.

13.     The Management Defendants also knew that, if there came a time when they needed Headlam to sign checks for alleged "expenses" associated with HMPC, they would agree to do so because: (i) the Management Defendants could manipulate Headlam into doing so by the payments they would make to him allowing them to "own" HMPC; and (ii) the Management Defendants could strong-arm Headlam into signing the checks under threats of alerting the medical licensing boards of Headlam's failure to practice medicine through HMPC, which would put Headlam's medical license at significant risk.

14.     Once Headlam provided their information to Grody, the Defendants launched the scheme using their name and HMPC.  In connection with their discussions with Grody, Headlam

agreed to provide "supervisory" services related to the alleged performance of videonystagmus ("VNG") testing and transcranial doppler tests ("TDT"). Though Headlam was asked to also perform and/or supervise the performance of ESWT, Headlam made it clear to Grody that he was not willing to do so.

15.     Despite Headlam's refusal to perform or supervise ESWT, the information and documents that Grody had already secured regarding HPMC were improperly used, and HMPC and Headlam's name and license number were used to bill GEICO for more than $1.1 million of ESWT allegedly performed in a period of approximately six (6) weeks from more than forty (40) locations.

16.     On or about the same time that Grody obtained Headlam's information and the necessary documents to implement the fraudulent scheme, the Management Defendants colluded with Meladze, Blue Tech, and Sunstone (collectively, the "Meladze Defendants") to establish a mechanism to control and launder the "assets" of HMPC and ensure the proceeds of HMPC remained in their hands and the hands of others involved in the scheme.  The Meladze Defendants were a perfect partner in terms of funneling the illegal proceeds and financing the fraudulent scheme, because they were willing to engage in fraudulent financial transactions and convert the illegal proceeds of the scheme into cash that would be used to fund the fraudulent scheme and illegally siphon the profits away from Headlam.

17.     The Management Defendants took the information acquired from Headlam, and without Headlam's knowledge or consent, used that information to: (i) fabricate and generate false and fraudulent documents, including NF-3 forms (i.e., bills), assignment of benefit ("AOB") forms, and medical records; and (ii) operate and control HMPC as a fictional healthcare "practice"

to serve as a vehicle through which millions of dollars of billing for ESWT could be submitted to GEICO and other New York automobile insurers.

18.     Because HMPC was nothing more than a shell to hide the other Defendants' participation in the scheme, it was critical to the success of the fraudulent scheme for the Defendants to partner with New York collection attorneys to create an appearance of legitimacy by:

> (i)     purporting to represent the physician and the billing entity;

> (ii)    providing for or facilitating "funding" (i.e., financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme through companies in which the attorney/law firms either owned or with whom they had relationships;

> (iii)   pursuing payment and collection against GEICO and other New York automobile insurers by knowingly: (a) submitting fraudulent bills to the insurers for the ESWT; and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

> (iv)    accepting the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to themselves and other third parties.

19.     At the time, the Management Defendants had an ongoing relationship with New York collection attorneys who would facilitate the funding (i.e., the securing of advances against the claims) and the billing and collections on the fraudulent claims.  As such, and in coordination with the Meladze Defendants, the Management Defendants contacted a well-known New York law firm to provide billing and collection services on behalf of HMPC in relation to the fraudulent claims (the "Collection Lawyers").

20.     In addition to arranging to have the Collection Lawyers represent Headlam and HMPC in relation to the billing and collection of the fraudulent claims, the Management Defendants, in association with the Meladze Defendants, also used Headlam's information and

signature to create false "funding" arrangements to fuel the fraudulent HMPC scheme and to hide their participation.  The Management Defendants arranged for the fraudulent claims to be "funded" through a company that was one of among many associated with the Collection Lawyers, formed as a Delaware limited liability company, and known as Financial Vision Capital Group II, LLC ("Financial Vision").  In relation to the fraudulent scheme, the Management Defendants communicated with the Collection Lawyers, directing the firm how to distribute the advances that were related to each "batch" of HMPC's fraudulent claims, and to make payment of them through the bank accounts of Blue Tech and Sunstone.

21.  The information misappropriated by the Management Defendants was then used by them to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including the AOB forms and other medical records; (ii) the engagement letter and associated documents needed by the Collection Lawyers to bill and collect on the ESWT; and (iii) the funding agreements with Financial Vision.  Once the documents were in place, Financial Vision began transferring money to the Meladze Defendants as "advances" against the claims for the ESWT.  Neither the Management Defendants, nor the Meladze Defendants were signatories to the funding agreements, but they received the money without risk, and used the payments received from Financial Vision for their own benefit, as well as to pay individuals and entities to perpetuate the fraudulent scheme.

22.  The Management Defendants provided the package of documents associated with billing, collection, and funding efforts to the Collection Lawyers, who, upon receipt, organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment. The Collection Lawyers, in turn: (i) purported to represent Headlam and HMPC in hundreds of writings sent to GEICO; (ii) arranged and/or interfaced to effectuate the "funding" of the bills that

were submitted to GEICO and other New York insurers in the name of HMPC; (iii) systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of HMPC; and (iv) collected insurance payments from GEICO and other New York automobile insurers and deposited those payments into their IOLA/Trust Accounts.

23.     The Management Defendants were also able to leverage their established relationships and contacts within the no-fault industry, including their relationships with individuals that: (i)  operate, manage and are associated with the Clinics; (ii) collect the no-fault claims (i.e., the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance; and (iii) refer the no-fault billing and collection work to the Collection Lawyers.

24.     The fraudulent scheme employed by the Management Defendants to generate the billings submitted to GEICO and other New York automobile insurers involved the Management can be summarized as follows: (i) unlicensed "technicians", who were not employed by HMPC, would allegedly render the ESWT on an itinerant basis at the Clinics; (ii) the unlicensed "technicians" – who, in fact, had no qualifications that would permit them to perform the ESWT – would generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory ESWT; and (iii) the falsified reports, documents containing unauthorized stamped/photocopied signatures, and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the ESWT.

25.     As part of the scheme, HMPC and the Management Defendants – utilizing some of the cash that was illegally laundered through Blue Tech and Sunstone's bank accounts, with the assistance of the Meladze Defendants – established illegal referral and kickback arrangements with

the owners and/or managers of the Clinics to allow the Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care. The Defendants also established relationships with individuals and companies to provide unlicensed technicians to perform the ESWT at the Clinics.

26.     The flow of funds associated with the present scheme illustrates its fraudulent nature:

    (i)    Over $1.1 million in advances from Financial Vision were paid over through the Collection Lawyers' IOLA Account to the Meladze Defendants based on the advances made on HMPC's fraudulent claims;

    (ii)    The Meladze Defendants in turn, transferred the money along with $8,000,000.00 in additional funds to a jeweler in New York City so that it could be further laundered and converted to cash and other untraceable assets;

    (iii)    That money was in turn used by HMPC and the Management Defendants to support the illegal referral and kickback arrangements with the owners and/or managers of the Clinics and to illegally siphon the profits of the HMPC to themselves and to others; and

    (iv)    The money received from the insurance companies were all deposited by Collection Lawyers into their IOLA Accounts and paid to themselves and to Financial Vision.

27.     As discussed herein, Defendants, at all relevant times, have known that: (i) the name, signature, personal information and license number of Headlam, as well HMPC, were misappropriated and unlawfully used to bill for and collect money from GEICO for the ESWT; (ii) the ESWT was provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the ESWT was provided – to the extent provided at all – pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; and (iv) the ESWT – to the extent provided at all – was not

provided by Headlam or any other licensed physician but by persons who were never supervised by Headlam or employed by HMPC.

28.     The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that Defendants submitted, or caused to be submitted, to GEICO using the United States mail.

29.     The Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

30.     The Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1 million.

## THE PARTIES

### I.     Plaintiffs

31.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

32.     Defendant Stoyanovsky resides in and is a citizen of New York.

33.     Stoyanovsky is no stranger to no-fault insurance schemes.  In 2005, Stoyanovsky and his sham company, LVL Business Group, Inc., were named as defendants in a lawsuit alleging, among other things, that Stoyanovsky conspired with other individuals and sham companies to steal millions of dollars through New York's no-fault system by: (i) laundering millions of dollars through various entities Stoyanovsky and others controlled; (ii) illegally owning and controlling

several healthcare professional corporations; and (iii) submitting fraudulent diagnostic testing reports through these illegally owned and controlled healthcare professional corporations to insurance companies for reimbursement.  See Allstate Insurance Company et al. v. Batsiyan et al., 1:05-cv-05933-SJ-VVP (E.D.N.Y. 2005).  Stoyanovsky is also reported to have pleaded guilty to Scheme to Defraud in the Second Degree, a Class A Misdemeanor, in connection with his involvement in a massive scheme, and along with his companies, Physician Transcribing Inc. and LVL Business Group, Inc. were ordered to pay restitution in the amount of over $2.6 million in connection with a criminal case filed by the Kings County District Attorney's Office.

34.     Defendant Grody resides in and is a citizen of New York.

35.     Defendant HMPC is a New York professional corporation with its principal place of business in New York.  HMPC identifies as its primary operating location 68 South Service Road, Melville, New York (the "South Service Road Location").

36.     Defendant Meladze resides in and is a citizen of New York.  In 2008, Meladze pled guilty to Conspiracy to Distribute Controlled Substance (Oxycontin) and was sentenced to 57 months in prison followed by three years supervised release. See USA v. Meladze, et al., 2:07-cr-00070-wks-1.

37.     Defendant Blue Tech is a New York corporation with its principal place of business in New York.  At all relevant times, Blue Tech was owned by Meladze.

38.     Defendant Sunstone is a New York corporation with its principal place of business in New York.  At all relevant times, Sunstone was owned by Meladze.

39.     The John Doe Defendants reside in and are citizens of New York, are unlicensed individuals, presently not identifiable to GEICO, and knowingly participated in the fraudulent scheme with the other Defendants and derived financial benefit from the fraudulent scheme.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §

1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive

of interests and costs, and is between citizens of different states.

41.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern

District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint

occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

42.     GEICO underwrites automobile insurance in New York.

**I.      An Overview of Pertinent Law Governing No-Fault Reimbursement**

43.     New York's no-fault laws are designed to ensure that injured victims of motor

vehicle accidents have an efficient mechanism to pay for and receive the health care services that

they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y.

Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§

65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to

provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

44.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses

incurred for health care goods and services, including medical services.

45.     An Insured can assign his/her right to No-Fault Benefits to health care goods and

services providers in exchange for those services.

46.     Pursuant to a duly executed assignment, a health care provider may submit claims

directly to an insurance company and receive payment for medically necessary services, using the

claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

47.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

48.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….   (Emphasis added).

49.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

50.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

51.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

52.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

53.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

54.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

55.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

56.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not

eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

57.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

58.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

59.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.      Defendants' Fraudulent Headlam Scheme

### A.      The Recruitment of Headlam

60.     Headlam is a physician who became licensed to practice medicine in New York in 2016.

61.     According to public record searches, Headlam represents to the public that they practice physical medicine and rehabilitation from a healthcare facility located at 930 East Tremont

Avenue, Bronx, New York and that they operate a physical medicine and rehabilitation practice at the South Service Location.

62.     In the summer of 2021, Headlam was recruited by Grody to provide supervisory services related to the performance of videonystagmography testing ("VNG") and transcranial doppler testing ("TDT").  Headlam initially agreed to perform supervisory services associated with VNG and TDT testing, and provided Grody with his name, medical license, and the tax identification number of HMPC so that these services could be billed to insurance companies. However, Grody also asked whether Headlam wanted to become involved with or supervise any other healthcare services, including but not limited to ESWT.  Headlam refused and made clear to Grody that they did not, because they were not familiar with the services.

63.     Without Headlam's knowledge or consent, Grody provided the information that Headlam had given to him to Stoyanovsky and the John Doe Defendants so that they in turn could perform and bill for ESWT.

**B.     Defendants Place the Fraudulent Scheme in Motion**

64.     Once the information from Headlam was secured, Defendants put the fraudulent scheme into motion.

65.     The Management Defendants took multiple steps to begin the process of billing automobile insurers, including GEICO, for the ESWT that were purportedly provided by HMPC and Headlam.  As part of the scheme, the Defendants created sham agreements and directives associated with the ESWT, including a funding agreement pursuant to which financial advances would be made on the claims for the Fraudulent Services.  In contrast to a legitimate funding arrangement, the "advances" made by Financial Vision in relation to the HMPC billings were wired (using the Collection Lawyers' IOLA Trust Account) into the bank accounts of Blue Tech

and Sunstone.  This included over $1.3 million of "advances" made against the account receivables associated with the ESWT submitted through HMPC.

66.     The funding agreements included economic and non-economic terms that were intended to and did allow the Defendants to exercise control over all material financial and operational aspects of HMPC and its assets.  This included over $1.3 million of "advances" made by the Collection Lawyers against the account receivables associated with the ESWT submitted through HMPC.  These advances were a critical part to the success of the fraudulent scheme because:

> (i)     The advances: (a) provided the necessary cash needed to establish and maintain the illegal relationships with the Clinics in order to gain access to Insureds for purposes of providing the Fraudulent Services; and (b) gave the Defendants the ability to hide from GEICO and other automobile insurers the flow of funds that were needed to operate the fraudulent scheme; and
>
> (ii)    Defendants (through the Collection Lawyers and Financial Vision) would be in total control of the account receivables associated with the billing for the Fraudulent Services and would profit off the payments received from GEICO and other New York automobile insurers.

67.     In fact, there was never authorization from Headlam to fund account receivables associated with the performance of ESWT, and Headlam never authorized anyone to: (i) submit bills to GEICO for the Fraudulent Services using Headlam's name or the name of HMPC, (ii) collect money on behalf of HMPC or Headlam in relation to ESWT; or (iii) distribute money collected in relation to ESWT to themselves or to any third-party for the Fraudulent Services.

68.     Even though the monies received from GEICO and other New York automobile insurers were deposited by the Collection Lawyers into their IOLA/Trust Account, not a single dollar in relation to the performance of and billing for ESWT was ever paid to Headlam or HMPC.

### C.    The Illegal Financial and Kickback Arrangements

69.    HMPC had no legitimate indicia in relation to the Fraudulent Services.  It had no fixed treatment locations of any kind, did not maintain stand-alone practices, was not the owner or leaseholder in any of the real property from which it purported to provide the Fraudulent Services, did not employ their own support staff, and did not advertise their existence or market its services to the general public.

70.    In fact, the Management Defendants controlled HMPC by using the name and medical license of Headlam to "operate" HMPC on an itinerant basis in connection with the performance of the Fraudulent Services from more than forty (40) separate Clinics, primarily located in Brooklyn, Queens, and Bronx, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangement, including the following:

| Clinic - Street Address | Clinic – City/Borough | Clinic - Street Address | Clinic – City/Borough |
|---|---|---|---|
| 3250 Westchester Avenue | Bronx | 2386 Jerome Avenue | Bronx |
| 2488 Grand Concourse | Bronx | 240-19 Jamaica Avenue | Bellerose |
| 3910 Church Avenue | Brooklyn | 282 Avenue X | Brooklyn |
| 1735 Pitkin Avenue | Brooklyn | 332 East 149th Street | Bronx |
| 3041 Avenue U | Brooklyn | 358 Neptune Avenue | Brooklyn |
| 2673 Atlantic Avenue | Brooklyn | 625 East Fordham Avenue | Bronx |
| 1655 Richmond Avenue | Staten Island | 2016 Grand Avenue | Baldwin |
| 102-28 Jamaica Avenue | Jamaica | 4014 Boston Road | Bronx |
| 9016 Sutphin Boulevard | Jamaica | 430 West Merrick Road | Valley Stream |
| 548 Howard Avenue | Brooklyn | 2088 Flatbush Avenue | Brooklyn |
| 1611 East New York Avenue | Brooklyn | 62-69 99th Street | Rego Park |
| 4250 White Plains Road | Bronx | 97-14 Rockaway Boulevard | Ozone Park |
| 150 Graham Avenue | Brooklyn | 652 East Fordham Road | Bronx |
| 665 Pelham Parkway | Bronx | 1120 Morris Park Avenue | Bronx |
| 2184 Flatbush Avenue | Brooklyn | 1894 Eastchester Road | Bronx |
| 245 Rockaway Avenue | Valley Stream | 9801 Foster Avenue | Brooklyn |
| 1568 Ralph Avenue | Brooklyn | 599 Southern Boulevard | Bronx |
| 3000 Eastchester Road | Bronx | 611 East 76th Street | Brooklyn |
| 222-01 Hempstead Avenue | Jamaica | 2273 65th Street | Brooklyn |

| 3626 East Tremont Avenue | Bronx | 219-16 Linden Boulevard | Jamaica |
|---|---|---|---|
| 647 Bryant Avenue | Bronx | 79-45 Metropolitan Avenue | Flushing |
| 175 Fulton Avenue | Hempstead | 560 Prospect Avenue | Brooklyn |
| 488 Lafayette Avenue | Brooklyn | 55 East 115th Street | New York |
| 148-21 Jamaica Avenue | Jamaica | | |

71.    To obtain access to the Clinics' patient base (i.e., the Insureds), the Management Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

72.    The Clinics provided facilities for the Management Defendants, and at the same time hosted a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

73.    In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

74.    At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base. The Clinics willingly provided patient access to the Management Defendants in exchange for kickbacks and

other financial incentives, because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and, therefore, catered to a high volume of Insureds at the locations.

75.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent". These payments were, in reality, kickbacks for referrals, as the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinics' "representatives" to HPMC and the Management Defendants for the performance of the Fraudulent Services.  To facilitate the kickback payments, which were in cash and typically disguised as "rent", the Defendants laundered approximately $1.3 million paid by Financial Vision through the bank accounts of Blue Tech and Sunstone.

76.     In keeping with the fact that the Clinics controlled the patient base which was accessed through the payments and that HMPC was one of several interchangeable "cogs" in an ongoing fraud wheel during the relevant time period, there were numerous instances where HMPC was: (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the Fraudulent Services on Insureds; and (ii) was one of numerous "providers" rendering the Fraudulent Services at specific Clinic locations in weekly sequences.

77.     The following are representative examples:

    (i)     An Insured named AB was involved in an automobile accident and presented to the Church Ave Clinic. While treating at the Church Ave Clinic, AB purportedly received ESWT from Headlam through HMPC, and also purportedly received ESWT from: (i) Emmons Avenue Medical Office ("Emmons") by Oganesov; (ii) CVAP Medical PC ("CVAP") by Crystal Antoine-Pepeljugoski, M.D. ("Pepeljugoski"); (iii) Eric Kenworthy, M.D. ("Kenworthy"); (iv) Sergey Kalitenko; (v) Mark Vine M.D. ("Vine"); (vi)

Grace Medical Health Provider, P.C. by Opeoluwa Eleyinafe, M.D. Eleyinafe; and (vii) MJG Medical Services by Max Jean-Gilles, M.D.;

(ii)     An Insured named EF was involved in an automobile accident and presented to the Clinic located at 647 Bryant Avenue, Bronx, New York (the "Bryant Ave Clinic"). While treating at the Bryant Ave Clinic, EF purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Emmons by Oganesov; (ii) CVAP by Pepeljugoski; (iii) Community Medical Care of NY, PC by Ahmad Riaz, M.D.; (iv) Healthwise Medical Associates, PC by Dominic Onyema, M.D.; and (v) Kenworthy;

(iii)    An Insured named AW was involved in a motor vehicle accident and presented to the 3000 Eastchester Road Clinic. While treating at the 3000 Eastchester Road Clinic, AW purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Elena Borisovna Stybel, M.D. ("Stybel"); and (ii) Vine;

(iv)    An Insured named MS was involved in a motor vehicle accident and presented to the Church Ave Clinic. While treating at the Church Ave Clinic, MS purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Kenworthy; and (ii) Vine;

(v)     An Insured named JR was involved in a motor vehicle accident and presented to the Bryant Ave Clinic. While treating at the Bryant Ave Clinic, JR purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Kenworthy; (ii) Vine; and (iii) Sangeet Khanna, M.D. ("Khanna");

(vi)    An Insured named IF was involved in a motor vehicle accident and presented to the Church Ave Clinic. While treating at the Church Ave Clinic IF purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Kenworthy; and (ii) Vine;

(vii)   An Insured named AG was involved in a motor vehicle accident and presented to the 3000 Eastchester Road Clinic. While treating at the 3000 Eastchester Road Clinic, AG purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Stybel; and (ii) Vine;

(viii)  An Insured named BC was involved in a motor vehicle accident and presented to the Clinic located at 4250 White Plains Road, Bronx, New York (the "White Plains Road Clinic"). While treating at the White Plains Road Clinic, BC purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Stybel; and (ii) Vine;

(ix)    An Insured named ME was involved in a motor vehicle accident and presented to the Clinic located at 1655 Richmond Avenue, Staten Island, New York (the "Richmond Avenue Location"). While treating at the Richmond Avenue Location, ME purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Jean-Pierre Georges Barakat, M.D.; (ii) Kenworthy; and (iii) Lorraine Riotto, M.D.; and

(x)    An Insured named AR was involved in a motor vehicle accident and presented to the Clinic located at 3250 Westchester Avenue, Bronx, New York (the "Westchester Ave Clinic"). While treating at the Westchester Ave Clinic, AR purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Miklos Losonczy, M.D.; and (ii) Sherrie Rawlins, M.D.

78.    Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

**D.    Defendants' Fraudulent Billing and Treatment Protocols**

79.    The Fraudulent Services billed in the name of HMPC were not medically necessary and were provided - to the extent they were provided at all - pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds. The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

80.    Neither Headlam nor any other licensed physician was ever involved in the performance of the Fraudulent Services. Unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics. Once they were given access, the Management Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services and submit to purported therapy services that were

experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

81.     The only point in having the Insureds seen by the unlicensed technicians was to get the Insureds signature on a piece of paper so that the Management Defendants could generate bills in the name of HMPC to submit to GEICO and other New York automobile insurers for reimbursement.

82.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

83.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.  This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

84.     Through the fraudulent scheme, HMPC was used to bill GEICO and other automobile insurers millions of dollars for the performance of the Fraudulent Services in a "quick hit" style, using HMPC along with other entities only for a matter of a couple of months, thereby attempting to limit the insurance companies' ability to investigate and address the fraudulent scheme.

85.     The Management Defendants had unlicensed technicians purportedly subject Insureds to medically unnecessary, ESWT "treatments".  In keeping with the fact that the Management Defendants intended to conceal the absence of involvement by any physician, the Management Defendants arranged to have the services documented on a generic "form" that

simply printed "Headlam Medical Professional Corporation, P.C.", and listed the Service Road

Location on the top of the form, and Headlam's photocopied signature on the bottom.

86.     The following are representative examples:



87.     Of consequence, the claims submitted to GEICO in the name of HMPC included

an NF-3 form falsely representing that Headlam performed ESWT "treatments" and included

"reports" and "notes" associated with the ESWT "treatments" that did not identify who actually

performed the service.

88.     The billing data associated with the claims submissions made to GEICO

corroborates the fraudulent nature of the billing/treatment protocols. According to the billing, the

ESWT "treatment" alleged to have been performed on Insureds through HMPC purported that in

only approximately twenty-three (23) separate dates of service: (i) ESWT was performed on more

than 440 separate patients; (ii) ESWT was performed at over forty (40) separate locations; and (iii) HMPC provided ESWT at multiple locations at the same day, with multiple instances including 10 or more separate treatment locations on some days.

89.    Once documented by the unidentified service provider, HMPC was used to bill GEICO for reimbursement for the ESWT using CPT code 0101T.

## CATEGORY III CODES

**Medical Fee Schedule**

0042T–0504T

**Effective April 1, 2019**

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

90.    As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.

91.    Additionally, and as noted in the Fee Schedule, the CPT code: (i) is scheduled to be paid using the conversion rate for surgical services; and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

26

92.     Furthermore, the ESWT allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons.

93.     In the first instance, the charges were fraudulent in that the unlicensed technicians controlled by the Management Defendants did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T.

94.     Rather, HMPC and the Management Defendants arranged to have unlicensed technicians perform Radial Pressure Wave Therapy on the Insureds. Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave. Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.

95.     Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain; and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and, therefore, not covered.

96.     Notwithstanding the experimental nature, HMPC and the Management Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every

Insured, without regard to each Insured's individual complaints, symptoms, or presentation. In furtherance of that, HMPC and the Management Defendants typically submitted a boilerplate, checklist treatment report containing a stamped signature, not an actual signature, and the ESWT was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

97.     For example, HMPC typically rendered ESWT to Insureds less than twenty (20) days after the accidents, including the following examples:

> (i)     HMPC purported to provide ESWT to an Insured named OP on September 3, 2021, only 5 days after the Insured's accident on August 29, 2021.
>
> (ii)    HMPC purported to provide ESWT to an Insured named KR on September 7, 2021, only 3 days after the Insured's accident on September 4, 2021.
>
> (iii)   HMPC purported to provide ESWT to an Insured named RSG on September 9, 2021, only 4 days after the Insured's accident on September 5, 2021.
>
> (iv)    HMPC purported to provide ESWT to an Insured named TM on September 16, 2021, only 4 days after the Insured's accident on September 12, 2021.
>
> (v)     HMPC purported to provide ESWT to an Insured named SJ on September 17, 2021, only 4 days after the Insured's accident on September 13, 2021.
>
> (vi)    HMPC purported to provide ESWT to an Insured named DA on September 30, 2021, only 5 days after the Insured's accident on September 25, 2021.
>
> (vii)   HMPC purported to provide ESWT to an Insured named DD on September 30, 2021, only 5 days after the Insured's accident on September 25, 2021.
>
> (viii)  HMPC purported to provide ESWT to an Insured named KO on September 30, 2021, only 7 days after the Insured's accident on September 23, 2021.
>
> (ix)    HMPC purported to provide ESWT to an Insured named SG on October 13, 2021, only 4 days after the Insured's accident on October 9, 2021.
>
> (x)     HMPC purported to provide ESWT to an Insured named JTK on October 28, 2021, only 6 days after the Insured's accident on October 22, 2021.

98.     These are only representative examples.

99.     Additionally, HMPC falsely claimed to have routinely provided ESWT to multiple

Insureds involved in the same accident from the same Clinics:

(i)     On February 23, 2021, three Insureds – JC, CLF and KP – were involved in the same automobile accident. Thereafter, JC, CL, and KP all presented to the same Clinic located at 150 Graham Avenue, Brooklyn, New York, and each purportedly received ESWT "treatments" through HMPC.

(ii)    On April 29, 2021, two Insureds – KC and TW – were involved in the same automobile accident. Thereafter, KC and TW both presented to the Clinic located at 9016 Sutphin Boulevard, Jamaica, New York, and both purportedly received ESWT "treatments" through HMPC.

(iii)   On May 7, 2021, two Insureds – KF and MR – were involved in the same automobile accident. Thereafter, KF and MR both presented to the Clinic located at 3910 Church Avenue, Brooklyn, New York (the "Church Ave Clinic"), and both purportedly received ESWT "treatments" through HMPC.

(iv)    On June 23, 2021, two Insureds – LG and JT – were involved in the same automobile accident. Thereafter, LG and JT both presented to the Clinic located at 665 Pelham Parkway, Bronx, New York, and both purportedly received ESWT "treatments" through HMPC.

(v)     On June 26, 2021, two Insureds – SH and JR – were involved in the same automobile accident. Thereafter, SH and JR both presented to the 3000 Eastchester Road Clinic, and both purportedly received ESWT "treatments" through HMPC.

(vi)    On July 4, 2021, three Insureds – AJ, CJ, and SJ – were involved in the same automobile accident. Thereafter, AJ, CJ and SJ all presented to the Clinic located at 102-28 Jamaica Avenue, Jamaica, New York, and each purportedly received ESWT "treatments" through HMPC.

(vii)   On July 5, 2021, two Insureds – ME and NR – were involved in the same automobile accident. Thereafter, ME and NR both presented to the Clinic located at 1655 Richmond Avenue, Staten Island, New York, and both purportedly received ESWT "treatments" through HMPC.

(viii)  On July 11, 2021, two Insureds – KNB and FO – were involved in the same automobile accident. Thereafter, KB and FO both presented to the Clinic located at 1894 Eastchester Road, Bronx, New York, and both purportedly received ESWT "treatments" through HMPC.

(ix)    On July 17, 2021, two Insureds – BC and JC – were involved in the same automobile accident. Thereafter, BC and JC both presented to the Clinic

located at 4250 White Plains Road, Bronx, New York, and both purportedly received ESWT "treatments" through HMPC.

(x)    On August 13, 2021, two Insureds – BB and TC – were involved in the same automobile accident. Thereafter, BB and TC both presented to the Clinic located at 219-16 Linden Boulevard, Jamaica, New York, and both purportedly received ESWT "treatments" through HMPC.

(xi)    On August 15, 2021, two Insureds – TAB and AH – were involved in the same automobile accident. Thereafter, TB and AH both presented to the Clinic located at 222-01 Hempstead Avenue, Jamaica, New York, and both purportedly received ESWT "treatment" through HMPC.

(xii)    On August 20, 2021, two Insureds – JE and JN – were involved in the same automobile accident. Thereafter, JE and JN both presented to the Clinic located at 2673 Atlantic Avenue, Bronx, New York, and both purportedly received ESWT "treatment" through HMPC.

(xiii)    On August 26, 2021, two Insureds – XR and BV – were involved in the same automobile accident. Thereafter XR and BV both presented to the Clinic located at 599 Southern Boulevard, Bronx, New York, and both purportedly received ESWT "treatment" through HMPC.

(xiv)    On August 29, 2021, two Insureds – MM and RW – were involved in the same automobile accident. Thereafter, MM and RW both presented to the Clinic located at 3250 Westchester Avenue, Bronx, New York, and both purportedly received ESWT "treatments" through HMPC.

(xv)    On August 31, 2021, two Insureds – SAJ and MJS – were involved in the same automobile accident. Thereafter, SJ and MS both presented to the Clinic located at 22-73 65th Street, Brooklyn, New York, and both purportedly received ESWT "treatments" through HMPC.

100.    These are only representative examples.

101.    In all of the claims identified in Exhibit "1", Defendants falsely represented that the ESWT were medically necessary, when, in fact, they were not medically necessary for each Insured and provided pursuant to predetermined fraudulent protocols and were, therefore, not eligible to collect No-Fault Benefits in the first instance.

102.    In addition, the charges were also fraudulent, because the bills misrepresented the amounts collectible for each date of service. More specifically, CPT Code 0101T only

contemplates the billing for the code once per date of service. The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

103.     Notwithstanding the clear language of the code, the bills submitted in the name of HMPC fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) for each section of the Insured's body to which the ESWT was performed.

104.     The following is a representative sample:

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 09/24/2021 | 1655 Richmond Ave, Staten Island, NY, 10314 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE THORACIC AREA | 1 | 0101T | $ 700.39 |
| 09/24/2021 | 1655 Richmond Ave, Staten Island, NY, 10314 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LUMBAR AREA | 1 | 0101T | $ 700.39 |
| 09/24/2021 | 1655 Richmond Ave, Staten Island, NY, 10314 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE CERVICAL AREA | 1 | 0101T | $ 700.39 |

**TOTAL CHARGES TO DATE  $ 2101.17**

105.     In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by two (2) or three (3) times for each date of services.

106.     In all of the claims identified in Exhibit "1", the Defendants falsely represented that the ESWT charges were medically necessary, were performed by Headlam, and were appropriately charged, when, in fact, they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols, were inappropriately unbundled, and were, therefore, not eligible to collect No-Fault Benefits in the first instance.

**E.      The Fraudulent Billing for Independent Contractor Services**

107.    The Defendants' fraudulent schemes also included the submission of claims to GEICO in the name of HMPC seeking payment for services provided by individuals that it never employed.

108.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors. The healthcare services must be provided by the billing provider itself, or by its employees.

109.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

110.    During the relevant time period, hundreds of individual bills were submitted to GEICO using the United States mails seeking payment for the Fraudulent Services performed by individuals other than Headlam but billed in the name of HMPC, while falsely representing in

virtually all the bills that Headlam was the actual provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation were made regarding who performed the services and their relationship to the billing provider, which was being unlawfully operated and controlled by the Management Defendants.

111.    In fact, virtually all of the NF-3 forms submitted to GEICO contained the following representation:

| 16   IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| Headlam, Bo | M.D. | 286498 | EMPLOYEE · | INDEPENDENT CONTRACTOR ☐ | OTHER (SPECIFY) Owner |
| 17.   IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary) Bo Headlam, LIC# 286498 | | | | | |
| 18   IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | | | YES  ✓ | NO | |
| 19   ESTIMATED  DURATION OF FUTURE TREATMENT UNDETERMINED | | | | | |

112.    The statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians and/or individuals who performed the Fraudulent Services were never: (i) employed by Headlam or HMPC; (ii) under Headlam's direction and/or control; or (iii) paid by HMPC.

113.    The individuals who performed the Fraudulent Services were also simultaneously performing virtually identical services for other fraudulent "providers" that were operated and controlled by the Management Defendants and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

114.    By way of illustration, the great majority of the Insureds identified in Exhibit "1" received ESWT from various providers over a period of weeks or months, including HMPC, at a single Clinic, as noted in paragraph 78 above.

115.    Any individual alleged to have performed the Fraudulent Services could not have legitimately been employed by HPMC for among other reasons, they were simultaneously providing healthcare services for multiple "providers" (sometimes as many as five at the same time) at the same location and/or at different locations when they purported to provide services for HMPC.

116.    Because the Fraudulent Services were performed, to the extent they were provided at all, by individuals not employed by Headlam and/or HMPC, the Defendants never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this Complaint.

117.    The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay for the Fraudulent Services when, in fact, GEICO was not obligated to pay for the Fraudulent Services.

### III.    The Fraudulent Billing That Defendants Submitted or Caused to be Submitted to GEICO

118.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, AOBs and medical reports/records using the name of HMPC and its tax identification number and seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

119.     The NF-3 forms, reports, AOBs and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants virtually always misrepresented that Headlam had performed the Fraudulent Services and that Headlam's name, license and the tax identification numbers of HMPC was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the Management Defendants unlawfully and secretly controlled, and operated HMPC;

(ii)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided;

(iii)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements;

(iv)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and

(v)     The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided – to the extent provided at all – by unlicensed individuals not employed by Headlam or HMPC.

## IV.     **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

120.     Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

121.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

122.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Headlam in the performance of the Fraudulent Services and Headlam's ownership, control and/or management of HMPC. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that HMPC and the Management Defendants unlawfully exchanged kickbacks for patient referrals.

123.    Furthermore, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.  In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals that were employed by Headlam and HMPC.

124.    GEICO takes steps to timely respond to all claims and to ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon

them. As a result, GEICO incurred damages of more than $1 million based upon the fraudulent charges.

125.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against All Defendants**
**(Common Law Fraud)**

126.    GEICO incorporates, as though fully set forth herein, each and every allegation of this Complaint as if fully set forth at length herein.

127.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

128.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Headlam had performed the ESWT and that their name, medical license, and the tax identification numbers of HMPC and Headlam were being legitimately used to bill for the ESWT, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when, in fact, Headlam never performed any of the services and that the Defendants unlawfully and secretly owned, controlled, operated, and managed HMPC; (ii) the representation that the billed-for services had been rendered and were reimbursable, when, in fact, the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed-for services were eligible for reimbursement, when, in fact, the services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements between Defendants and the

Clinics; (iv) the representation that the billed-for services were medically necessary when they were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed-for services were eligible for payment because the services were provided by Headlam, when, in fact, the services were provided by unlicensed or other individuals that were never supervised by Headlam or employed by HMPC.

129.    The Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through HMPC that were not compensable under New York no-fault insurance laws.

130.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,054,000.00 pursuant to the fraudulent bills submitted by the HMPC Defendants.

131.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

132.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against All Defendants**
**(Unjust Enrichment)**

133.    GEICO incorporates, as though fully set forth herein, each and every allegation of this Complaint as if fully set forth at length herein.

134.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

135.    When GEICO paid the bills and charges submitted by or on behalf of HMPC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the HMPC Defendants' improper, unlawful, and/or unjust acts.

136.    The HMPC Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the HMPC Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

137.    The HMPC Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

138.    By reason of the above, the HMPC Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,054,000.00.

<b><u>AS AND FOR A THIRD CAUSE OF ACTION</u></b>
<b>Against All Defendants</b>
<b>(Conspiracy to Commit Fraud)</b>

139.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

140.    Defendants participated in a scheme to defraud GEICO as described above.

141.    Defendants had actual knowledge that the other Defendants in this action were committing fraud against GEICO.

142.    Defendants provided substantial assistance to one another to perpetuate the scheme to defraud described above by partnering with one another to: (i) use the  name, professional license, personal information and signature of Headlam, as well as the tax identification number of HMPC to perpetuate a fraudulent scheme; (ii) illegally operate and control HMPC and its assets

39

for their own financial benefit; (iii) generate false and fraudulent billing and supporting documents and submitting them to GEICO through HMPC; (iv) engage in illegal kickback arrangements to gain patient access and arrange to have independent contractors perform services pursuant to those illegal arrangements; (v) arrange for "funding" agreements between the Financial Vision and HMPC; (vi) arrange for the Collection Lawyers to represent Headlam and HMPC in regard to the submission of billing and collection, as needed, on the fraudulent claims submitted to GEICO; (vii) arrange to launder the "advances" to fund the illegal kickback arrangements and for their own financial benefit; (viii) conceal payments from the "advances" to one another and to the Clinics and their operators/managers to gain access to Insureds for purpose of providing the Fraudulent Services; and (ix) arrange to launder the insurance proceeds through the IOLA/Trust Accounts of the Collection Lawyers for purposes of distributing the insurance payments to themselves and to third-parties.

143.    The conspiratorial conduct of the Defendants to commit fraud against GEICO and the New York automobile insurance industry caused GEICO to pay more than $1,054,000.00 pursuant to the fraudulent bills submitted to GEICO through the Provider Defendants.

144.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

145.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages against the Defendants, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

146.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,054,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

B.      On the Second Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,054,000.00 together with costs, interest, and such other and further relief as the Court deems just and proper; and

C.      On the Third Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,054,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

Dated: February 8, 2024

RIVKIN RADLER LLP


By: _/s/ Barry I. Levy_____
        Barry I. Levy, Esq.
        Michael Vanunu, Esq.
        Garin Scollan, Esq.
        Alexandra Wolff, Esq.
926 RXR Plaza
Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

4874-0529-5262, v. 2