Barry I. Levy, Esq.
Michael Vanunu, Esq.
Alexandra Wolff, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

        Plaintiffs,

      -against-

VLADISLAV STOYANOVSKY, GARY GRODY a/k/a
LANCE GRODY, HEADLAM MEDICAL PROFESSIONAL
CORPORATION, ERIC MELADZE, BLUE TECH
SUPPLIES INC., SUNSTONE SERVICES INC., KIANAN
TARIVERDIEV, NAZIM TARIVERDIEV, DILSOD
ISLAMOV a/k/a "DILAN", DMITRIY KHAVKO, and JOHN
DOE DEFENDANTS "1" through "10",

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:
1:24-cv-01017-PKC-JAM

**Plaintiff Demands a Trial by
Jury**

## <u>AMENDED COMPLAINT</u>

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Amended Complaint against Defendants Vladislav Stoyanovsky

("Stoyanovsky"), Gary Grody a/k/a Lance Grody ("Grody"), Headlam Medical Professional

Corporation ("HMPC"), Eric Meladze ("Meladze"), Blue Tech Supplies Inc. ("Blue Tech"),

1

Sunstone Services Inc. ("Sunstone"), Kianan Tariverdiev ("K. Tariverdiev"), Nazim Tariverdiev ("N. Tariverdiev"), Dilsod Islamov a/k/a "Dilan" ("Islamov"), Dmitriy Khavko ("Khavko"), and John Doe Defendants "1" through "10" (the "John Doe Defendants") (collectively referred to hereinafter as the "Defendants") hereby allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      GEICO brings this action to recover more than $1 million the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services styled as extracorporeal shockwave therapy (hereinafter, "ESWT" or the "Fraudulent Services") allegedly provided to New York automobile accident victims who were insured by GEICO ("Insureds").  The fraudulent scheme was committed by the Defendants, none of whom are licensed healthcare professionals, by misappropriating the name, medical license, signature, and other information of a physician by the name of Bo Tyler Headlam, M.D. ("Headlam") and a medical professional corporation that was in Headlam's name, HMPC, and unlawfully using that professional corporation to bill GEICO and other New York automobile insurers for the Fraudulent Services.

2.      As discussed in more detail below, the claims submitted to GEICO seeking payment for the Fraudulent Services were never reimbursable, and the Defendants knew, at all relevant times, that:

> (i)      the Fraudulent Services were allegedly provided by and billed through HMPC, which was a medical "practice" not under the control and direction of Headlam, but rather, at all relevant times was operated, managed, and controlled by the Management Defendants (as defined below) and the John Doe Defendants, all of whom are unlicensed laypersons, for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

2

(ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to unlawful kickback and referral arrangements established between the Management Defendants and the Clinics (as defined below);

(iii)    the Fraudulent Services were not medically necessary and were provided, to the extent provided at all, pursuant to predetermined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)    the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds in order to inflate the charges submitted to GEICO and other automobile insurers; and

(v)    the Fraudulent Services, to the extent provided at all, were not provided by Headlam or any other licensed physician, but by persons who were unlicensed, and were neither directly supervised by Headlam nor employed by Headlam or HMPC.

3.    As a result of the scheme, the Management Defendants (as defined below) were able to use HMPC and Headlam's name and license number to bill GEICO alone more than $1.1 million for the alleged performance of ESWT over a period of approximately six (6) weeks from more than forty (40) separate clinic locations.

4.    The billing submitted to GEICO represented that the Fraudulent Services were performed at numerous individual locations starting in September of 2021. Hundreds of individual claims were submitted to GEICO seeking payment of no-fault benefits for the Fraudulent Services, all of which represented that Headlam legitimately owned and controlled HMPC, and that Headlam allegedly performed the Fraudulent Services. In truth, Headlam performed none of the Fraudulent Services and did not legitimately operate, manage, or control HMPC.

5.    Prior to September 2021, Headlam had billed GEICO in the name of HMPC for healthcare services provided to Insureds, but those services were markedly different, and never

3

included ESWT. HMPC's billing had been sporadic through the years, with the last billing prior to the commencement of the fraudulent scheme being in May 2020.

6.      Once the present scheme started, HMPC and its assets became unlawfully owned, managed, and controlled by Grody, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, and Islamov (collectively, the "Management Defendants"), none of whom are licensed healthcare professionals. Headlam did not perform any of the Fraudulent Services, did not otherwise treat the Insureds or operate, manage, or control HMPC.

7.      As discussed in more detail below, the fraudulent scheme involving HMPC and Headlam was only one scheme in a line of many carried out by the Management Defendants and started in June 2021 when Grody recruited Headlam, a licensed medical provider, to provide "supervisory" services related to the alleged performance of videonystagmus ("VNG") testing and transcranial doppler tests ("TDT"). Grody also asked Headlam to perform and/or supervise ESWT, however, Headlam made it clear to Grody that they were not willing to do so.  After Headlam agreed to provide supervisory services exclusively for VNG and TCD, Headlam provided Grody with their medical license number, the tax identification number for HMPC, a copy of their signature, and other information.

8.      The Management Defendants seized on the opportunity to use the information Headlam provided Grody to concoct a fraudulent treatment and billing scheme pursuant to which:

> (i)      The Management Defendants, along with the John Doe Defendants, participated in unlawful referral and kickback arrangements to gain access to patients at more than forty (40) multidisciplinary "clinics" located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics");

> (ii)     The Management Defendants arranged to have unlicensed "technicians", who were never employed by HMPC, provide the Fraudulent Services at

4

the various Clinics pursuant to a predetermined protocol designed to maximize billing for the Fraudulent Services;

(iii)    the reports, documents, and bills for thousands of dollars per patient per treatment date would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services;

(iv)    the billing for the Fraudulent Services would be "funded" through Financial Vision Capital Group II LLC ("Financial Vision") in a manner designed to finance the scheme's operation and allow the Management Defendants to profit from the fraudulent scheme while remaining hidden; and

(v)    Financial Vision would pay "advances" to bank accounts, per directives of the Management Defendants, as against the account receivables associated with the Fraudulent Services.

9.    Once Grody obtained the information from Headlam, the Management Defendants had what they needed to unlawfully operate, manage and control HMPC and use it as a vehicle to submit billing for the Fraudulent Services to GEICO and other New York automobile insurers. Specifically, the Management Defendants misappropriated and illegally used Headlam's name, medical license, signature, and other information, as well as the name and tax identification number of HMPC, to implement the fraudulent scheme.

10.    Defendants implemented the fraudulent scheme involving the illegal use of Headlam's medical license and HMPC's name beginning in the fall of 2021 on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things: (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement; (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule; and (iii) controlling reimbursement among providers who

5

rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

11.    In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which had historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established.

12.    Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – the service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and not typically portable.

13.    The Defendants seized on these changes in the Fee Schedule (or lack thereof), and put the fraudulent scheme into motion: (i) having previously used the information of several physicians to implement similar transient fraudulent schemes in New York; and (ii) knowing that Headlam was a vulnerable target because Headlam was in significant financial debt, evidenced by the fact that Headlam filed for Chapter 7 Bankruptcy on July 13, 2017, in the United States District Court in the Southern District of New York, and was highly motivated to protect their medical license.

14.    Because of Headlam's financial issues, the Management Defendants knew they could acquire and misappropriate Headlam's information if Headlam was convinced they could be hired for a "supervisory" position in exchange for the payment of money.

6

15.     The Management Defendants also knew that, if there came a time when they needed Headlam to sign checks for alleged "expenses" associated with HMPC, Headlam would agree to do so because: (i) the Management Defendants paid Headlam for allowing them to "own" HMPC, and the Management Defendants knew they could use those payments to manipulate Headlam; and (ii) the Management Defendants could strong-arm Headlam into signing the checks under threat of alerting the licensing boards of Headlam's failure to practice medicine through HMPC, which would put Headlam's medical license at significant risk.

16.     To finance and profit from the fraudulent scheme, the Management Defendants devised and implemented a series of financial arrangements between HMPC and Financial Vision to create false "funding" arrangements purportedly between Financial Vision and HMPC. The false funding arrangements included third-party payment directives and other documents that permitted Financial Vision to collect and retain the proceeds from insurance companies as payment for its participation.

17.     Financial Vision was a perfect partner for the Management Defendants in terms of financing the fraudulent scheme against GEICO and the New York automobile insurance industry because: (i) it was willing to make payments into accounts controlled by the Management Defendants without any contact or interaction with Headlam; and (ii) it could charge exorbitant fees on the monies that it would be advancing as a "premium" for its participation and willingness to provide advances to third-parties at the Management Defendants' direction.

18.     In furtherance of the fraudulent scheme, the Management Defendants partnered with New York-based collection law firms (the "Collection Lawyers") that agreed to:

(i)     purport to provide legal representation for Headlam and HMPC;

(ii)     work with the Management Defendants to arrange for funding of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme;

(iii)    pursue payment and collection against GEICO and other New York automobile insurers by: (a) knowingly submitting fraudulent bills to the insurers for the Fraudulent Services; and (b) pursing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid as needed;

(iv)    accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to Financial Vision; and

(v)     work with the Management Defendants, with whom they had ongoing relationships, and who knew what information would be needed to facilitate the funding, the billing and collections on the fraudulent claims, and profit from the fraudulent scheme.

19.    A New York City-based law firm (hereinafter the "FV Law Firm") was one of the Collection Lawyers with whom the Management Defendants and Financial Vision were intimately familiar. In addition to purporting to represent Headlam and HMPC, the FV Law Firm, at all times, acted as legal counsel for Financial Vision.

20.    Once the funding and legal relationships were in place, the Management Defendants and the John Doe Defendants used Headlam's license, HMPC, and Headlam's signature to: (i) generate false and fraudulent documents, including assignment of benefit ("AOB") forms and ESWT reports, to enable them to submit fraudulent no-fault insurance claims to GEICO and other insurers; and (ii) operate HMPC as a billing vehicle through which millions of dollars of billing for the Fraudulent Services could be submitted to and collected from GEICO and other New York automobile insurers.

21.    As part of the fraudulent scheme, the Management Defendants provided packages of documents, including fraudulent AOBs and ESWT reports, to the FV Law Firm. Once these documents were processed by the FV Law Firm and/or billing companies with whom they

8

associated, into bills (i.e., "NF-3" forms) using HMPC's name, the FV Law Firm organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment at the direction of the Management Defendants.

22.    Once the fraudulent bills were submitted to GEICO and other automobile insurers, purportedly on behalf of Headlam and HMPC, the law firm, at the direction of the Management Defendants, would prepare the claim submissions so that they could be funded by Financial Vision. Thereafter, the funding advances would be paid by through the FV Law Firm's IOLA/Attorney Trust Account – on behalf of Financial Vision – to accounts controlled by the Management Defendants.

23.    To maximize the amount of money that the Management Defendants could realize from the fraudulent scheme, all of the fraudulent billing submitted to GEICO and other automobile insurers was funded, and the advances were paid to bank accounts that were solely controlled by the Management Defendants.

24.    Specifically, the majority of the funding advances were paid through the FV Law Firm's IOLA/Attorney Trust Account to two shell companies owned by Meladze, known as Blue Tech and Sunstone (collectively, the "Meladze Defendants"). The payments were made to the Meladze Defendants to establish a mechanism to control and launder the "assets" of HMPC and ensure the proceeds of HMPC remained in their hands and the hands of others involved in the scheme. Neither the Management Defendants nor the Meladze Defendants were signatories to the funding agreements, but they received the money without risk, and used the payments received from Financial Vision for their own benefit, as well as to pay individuals and entities to perpetuate the fraudulent scheme.

25.     The Meladze Defendants were a perfect partner in terms of laundering the advances to finance the fraudulent scheme because they were willing to engage in fraudulent financial transactions and convert the illegal proceeds of the scheme into cash that would be used to fund the fraudulent scheme and illegally siphon the profits away from Headlam.

26.     With the cash they received from the Meladze Defendants, the Management Defendants were able to leverage their established relationships and contacts within the no-fault industry, including their relationships with individuals that: (i) operate, manage and are associated with the Clinics; (ii) collect the no-fault claims (i.e., the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance; and (iii) refer the no-fault billing and collection work to the Collection Lawyers.

27.     The fraudulent scheme employed by the Management Defendants to generate the billing submitted to GEICO and other New York automobile insurers can be summarized as follows: (i) unlicensed "technicians", who were not employed by HMPC, would allegedly perform ESWT on an itinerant basis at the Clinics; (ii) the unlicensed "technicians" – who, in fact, had no qualifications that would permit them to perform the ESWT – would generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory ESWT; and (iii) the falsified reports, documents containing unauthorized stamped/photocopied signatures, and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the ESWT.

28.     As part of the scheme, HMPC and the Management Defendants – utilizing some of the cash illegally laundered through the Meladze Defendants' bank accounts– established unlawful referral and kickback arrangements with the owners and/or managers of the Clinics to allow the

Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care. The Defendants also established relationships with individuals and companies to provide unlicensed technicians to perform the ESWT at the Clinics.

29.    The flow of funds associated with the present scheme illustrates its fraudulent nature:

(i)    Over $1 million in advances from Financial Vision made on HMPC's fraudulent claims were paid through the FV Law Firm's IOLA Account to the Meladze Defendants;

(ii)    The Meladze Defendants, in turn, transferred the money along with $8,000,000.00 in additional funds to a jeweler in New York City so that the funds be further laundered to gold and subsequently converted into cash and other untraceable assets;

(iii)    The laundered money was in turn used by HMPC and the Management Defendants to support the unlawful referral and kickback arrangements with the owners and/or managers of the Clinics and to illegally siphon the profits of the HMPC to themselves and to others; and

(iv)    The money received from insurance companies, including GEICO, was all deposited by the FV Law Firm into its IOLA Account and paid to itself and to Financial Vision.

30.    As discussed herein, Defendants, at all relevant times, have known that:

(i)    the name, signature, personal information and license number of Headlam, as well as HMPC, were misappropriated and unlawfully used to bill for and collect money from GEICO for the ESWT;

(ii)    the ESWT was provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons and as a result of unlawful financial arrangements between the Defendants and the Clinics;

(iii)    the ESWT was provided – to the extent provided at all – pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

11

(iv)    the claim submissions seeking payment for ESWT misrepresented and exaggerated the level of services that purportedly were provided to inflate the charges submitted to GEICO; and

(v)    the ESWT – to the extent provided at all – was not provided by Headlam or any other licensed physician but by persons who were never supervised by Headlam or employed by HMPC.

31.    The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that Defendants submitted, or caused to be submitted, to GEICO using the United States mail.

32.    The Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO. The Defendants' fraudulent scheme began in 2021 and continued uninterrupted through the middle of 2022. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1 million.

## THE PARTIES

### I.    Plaintiffs

33.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

34.    Defendant HMPC is a New York professional corporation with its principal place of business in New York. HMPC identifies as its primary operating location 68 South Service Road, Melville, New York (the "South Service Road Location").

35.     Defendant Stoyanovsky resides in and is a citizen of New York. Stoyanovsky is not a licensed healthcare professional.

36.     Stoyanovsky is no stranger to no-fault insurance schemes.  In 2005, Stoyanovsky and his sham company, LVL Business Group, Inc., were named as defendants in a lawsuit alleging, among other things, that Stoyanovsky conspired with other individuals and sham companies to steal millions of dollars through New York's no-fault system by: (i) laundering millions of dollars through various entities Stoyanovsky and others controlled; (ii) illegally owning and controlling several healthcare professional corporations; and (iii) submitting fraudulent diagnostic testing reports through these illegally owned and controlled healthcare professional corporations to insurance companies for reimbursement.  See Allstate Insurance Company et al. v. Batsiyan et al., 1:05-cv-05933-SJ-VVP (E.D.N.Y. 2005).  Stoyanovsky is also reported to have pleaded guilty to Scheme to Defraud in the Second Degree, a Class A Misdemeanor, in connection with his involvement in a massive scheme, and along with his companies, Physician Transcribing Inc. and LVL Business Group, Inc. were ordered to pay restitution in the amount of over $2.6 million in connection with a criminal case filed by the Kings County District Attorney's Office.

37.     More recently, Stoyanovsky has been named as a defendant – along with Grody – in another lawsuit filed in the Eastern District of New York that relates to no-fault insurance schemes involving recruiting a healthcare provider and using his/her name, professional license, and healthcare practice to fraudulently bill GEICO for No-Fault services that were never provided by the healthcare provider. See Gov't Emps. Ins. Co et al. v. Tristate Psychological Injury Services, P.C., et al., 1:23-cv-04091-RER-LB.

38.     Defendant Grody resides in and is a citizen of New York. Grody is not a licensed healthcare professional.

39.     Grody is no stranger to fraudulent insurance schemes. Grody holds himself out to the public to be a licensed clinical psychologist. In fact, Grody is a convicted felon who is not licensed to practice psychology or any other profession in the State of New York. Grody is uniquely familiar with how to manipulate New York's no-fault system to defraud insurance companies out of money for the financial benefit of himself and those with whom he associates.

40.     More specifically, in 2002, Grody was indicted in the Eastern District of New York and ultimately pleaded guilty in 2003 to three (3) separate counts in connection with a previous insurance fraud scheme, which resulted in him: (i) being imprisoned for more than a year and serving a supervised release for a period of three years; and (ii) paying restitution to Allstate Insurance Company of more than $280,000.00. Grody's federal imprisonment did not have the intended deterrent effect as, shortly after he was released, he became involved in a series of fraudulent insurance schemes that resulted in at least four (4) major automobile insurance companies filing a series of civil recovery actions against him and various others, with more than $10 million in judgments ultimately being entered against him. Upon information and belief, those judgments remain unsatisfied to date, and Grody remains incapable of openly operating within the healthcare industry or engaging in any legitimate activity, thereby contributing to his motive to engage in the furtive, fraudulent, and unlawful conduct described herein.

41.     More recently, Grody has been involved in multiple No-Fault insurance fraud schemes throughout 2021 and 2022 that are virtually identical to the allegations in this Complaint. Grody – and his various accomplices – have been named as Defendants in various lawsuits filed within the Eastern District of New York that – similar to this action – involve recruiting a healthcare provider and using his/her name, professional license, and healthcare practice/sole proprietorship to fraudulently bill GEICO for No-Fault services that were never provided by the

14

healthcare provider.  See e.g. Gov't Emps. Ins. Co. et al. v. Grody et al., 1:22-cv-03598-BMC; Gov't Emps. Ins. Co. et al. v. Tenenbaum et al., 1:22-cv-04543-ARR-PK; Gov't Emps. Ins. Co. et al. v. Stallings, et al., 1:22-cv-06306-DG-RML; Gov't Emps. Ins. Co. et al. v. Grody et al., 1:22-cv-068187-RER-PK; Gov't Emps. Ins. Co. et al. v. Bily-Linder et al., 1:23-cv-00515-FB-RML; Gov't Emps. Ins. Co. et al. v. Puzaitzer et al., 1:23-cv-074565-DLI-VMS; Gov't Emps. Ins. Co et al. v. Tristate Psychological Injury Services, P.C., et al., 1:23-cv-04091-RER-LB; Gov't Emps. Ins. Co. et al. v. Grody et al., 1:24-cv-04125-FB-MMH.

42.     Defendant Meladze resides in and is a citizen of New York.  In 2008, Meladze pled guilty to Conspiracy to Distribute Controlled Substance (Oxycontin) and was sentenced to 57 months in prison followed by three years supervised release. See USA v. Meladze, et al., 2:07-cr-00070-wks-1.

43.     Defendant Blue Tech is a New York corporation with its principal place of business in New York.  At all relevant times, Blue Tech was owned by Meladze.

44.     Defendant Sunstone is a New York corporation with its principal place of business in New York.  At all relevant times, Sunstone was owned by Meladze.

45.     Defendant N. Tariverdiev resides in and is a citizen of Pennsylvania. N. Tariverdiev is not a licensed healthcare professional. N. Tariverdiev is also the son of Defendant K. Tariverdiev.

46.     Defendant K. Tariverdiev resides in and is a citizen of New York. K. Tariverdiev is not a licensed healthcare professional.

47.     Defendant Khavko resides in and is a citizen of New York. Khavko is not a licensed healthcare professional.

48.     Khavko is also no stranger to no-fault insurance schemes. Khavko has also been long associated with the management of schemes involving fraudulent no-fault claims and has been

15

sued by GEICO for his involvement in similar schemes. See e.g. Gov't Emps. Ins. Co. et al. v. Khavko et al., 1:11-cv-05781-JRR-JO.

49.    Defendant Islamov resides in and is a citizen of New Jersey. Islamov is not a licensed healthcare professional.

50.    The John Doe Defendants reside in and are citizens of New York, are unlicensed individuals and entities, presently not identifiable to GEICO, that knowingly participated in the fraudulent scheme with the other Defendants and derived financial benefit from the fraudulent scheme.

## JURISDICTION AND VENUE

51.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

52.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

53.    GEICO underwrites automobile insurance in New York.

## I.    An Overview of Pertinent Law Governing No-Fault Reimbursement

54.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y.

16

Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

55.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

56.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

57.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

58.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

59.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

60.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv)

absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

61.    Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

62.    New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

63.    New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

64.    Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

65.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

66.    Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory

and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

67.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

68.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

69.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

70.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

19

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    Defendants' Fraudulent Headlam Scheme

### A.    The Origin of the Defendants' Fraudulent Scheme and its Components

71.    Headlam is a medical provider who became licensed to practice medicine in New York in 2016.

72.    According to public record searches, Headlam represents to the public that they practice physical medicine and rehabilitation from a healthcare facility located at 930 East Tremont Avenue, Bronx, New York, and that they operate a physical medicine and rehabilitation practice at the South Service Road Location.

73.    In the summer of 2021, Headlam was recruited by Grody to provide supervisory services related to the performance of VNG and TDT testing.  Headlam initially agreed to perform supervisory services associated with VNG and TDT testing, and provided Grody with his name, medical license, and the tax identification number of HMPC so that these services could be billed to insurance companies.  However, Grody also asked whether Headlam wanted to become involved with or supervise any other healthcare services, including but not limited to ESWT. Headlam refused and made clear to Grody that they did not because they were not familiar with the services.

74.    Without Headlam's knowledge or consent, Grody provided the information that Headlam had given to him to the other Management Defendants so that they in turn could bill for ESWT.

20

75.     In a "quick hit" fashion, Grody, in association with HMPC and the Management Defendants, submitted billing for the Fraudulent Services through HMPC over the course of a six-week period from September 2021 to October 2021.

76.     Before the Management Defendants were to start billing for TDT and VNG services, Grody introduced Headlam to N. Tariverdiev, with whom they discussed Headlam's supervision of TDT and VNG services through HMPC.

77.     At the time of Grody introduced Headlam to N. Tariverdiev, Grody and N. Tariverdiev had already been working with K. Tariverdiev, Stoyanovsky, Khavko, and Islamov to unlawfully own and control other healthcare providers and use those healthcare providers as a vehicle to submit fraudulent bills to GEICO and other New York automobile insurers.

78.     For example, the Management Defendants had operated schemes, similar to the one they planned through HMPC, including some with psychology providers. See Gov't Emps. Ins. Co. et al. v. Karin Gepp, Ph.D. (A Sole Proprietorship), et al., 1:22-cv-02860-ARR-MMH; Gov't Emps. Ins. Co. et al. v. Stallings, et al., 1:22-cv-06306-DG-RML; Gov't Emps. Ins. Co. et al. v. Erroll C. Mallett, M.D. et al., 1:22-cv-03661-KAM-VMS; Gov't Emps. Ins. Co. et al. v. Tristate Psychological Injury Services, P.C., et al., 1:23-cv-04091-RER-LB.

**B.     The Management Defendants' Illegal Operation and Control of HMPC**

79.     Once Headlam gave Grody HMPC's information, the Management Defendants took multiple steps to unlawfully operate and control HMPC in its entirety and use HMPC to bill automobile insurers, including GEICO, for the Fraudulent Services without Headlam's knowledge or consent.

21

80. At all times, the Management Defendants – working collaboratively with Financial Vision and the John Doe Defendants – exercised complete and unlawful control over HMPC in relation to its operation, patient care, billing, finances, and profit for the Fraudulent Services.

81. Each of the Management Defendants had their collective and independent roles in the fraudulent scheme. For example, each of the Management Defendants had: (i) access to various Clinics that would be used for HMPC to gain access to patients; and (ii) access to Collection Lawyers. In addition to their connections to Clinics and Collection Lawyers, each of the Management Defendants' respective roles were as follows:

(i) Stoyanovsky had access to Financial Vision, which would provide funding for the fraudulent scheme, and the FV Law Firm, which acted as Collection Lawyers. Stoyanovsky was one of the primary points-of-contact for the FV Law Firm when information was needed or when documents required Headlam's signature;

(ii) K. Tariverdiev handled the finances of the fraudulent scheme through HMPC, including distributing monies that were received in cash to himself and the other Management Defendants;

(iii) N. Tariverdiev and Islamov handled the day-to-day operations of the fraudulent scheme, including making sure all paperwork was submitted to the FV Law Firm, which submitted the bills to GEICO, communicating with the Clinics and the unlicensed "technicians" at the Clinics, communicating with the FV Law Firm, and acting as the liaison between the Clinics and the FV Law Firm;

(iv) Khavko was in charge of creating the claim submissions that were used to submit the charges for Fraudulent Services to GEICO and other New York automobile insurers; and

(v) Grody oversaw the unlicensed "technicians" who appeared at the Clinics and purported to provide ESWT to patients on behalf of HMPC, communicated with Headlam, controlled the HMPC bank account, and – at the direction of N. Tariverdiev and Islamov – issued payments from the HMPC account for funds that were purportedly for the benefit of HMPC.

82. In keeping with the fact that Grody – as an unlicensed layperson – illegally exercised control over HMPC, Grody would direct Headlam to issue checks to specific individuals

and/or entities on behalf of HMPC and in what amounts. For example, Grody instructed Headlam to issue checks to two entities, including a check to "Bristol Management Consultants" for $50,000.00, and two checks to "Peace 2012, Inc." totaling more than $14,000.00. Notably, neither of these entities appear to have any legitimate business presence, and the owner of Peace 2012, Inc., Artur Kofman, has been recently named as a defendant in an action resulting from his alleged involvement in another No-Fault insurance fraud scheme. See Gov't Emps. Ins. Co. et al. v. Chai Diagnostics LLC, et al., 1:24-cv-02704-PK.

83.     In keeping with the fact that Stoyanovsky and Khavko – both of whom are unlicensed laypersons – illegally exercised control over HMPC, Stoyanovsky and Khavko communicated with the FV Law Firm regarding issues relating to the collection of no-fault claims for HMPC, agreements with the FV Law Firm and Financial Vision, and information regarding the funding advances purportedly issued on behalf of Financial Vision.

84.     For example, on August 4, 2021, the FV Law Firm sent an email to Stoyanovsky, N. Tariverdiev, and Khavko stating that the FV Law Firm needed information related to the first "batch" of Financial Vision funded claims for HMPC. At no point did the FV Law Firm, Stoyanovsky, or Khavko notify or communicate with Headlam about funding this batch of claims, nor did anyone inform Headlam that the funding advances would be sent to the Meladze Defendants.

85.     As an additional example, on August 9, 2021, the FV Law Firm emailed Stoyanovsky and N. Tariverdiev asking to have the attached contract between HMPC and a billing company called, "Green Bills LLC," signed "ASAP."

86.     In keeping with the fact that N. Tariverdiev and Islamov – as unlicensed laypersons – illegally exercised control over HMPC, N. Tariverdiev and Islamov frequently emailed the FV

Law Firm on behalf of HMPC using the email addresses of probiller2021@gmail.com and 2266office@gmail.com.

87.     For example, N. Tariverdiev and Islamov communicated via email with the FV Law Firm regarding: (i) automobile insurance companies seeking examinations under oath of HMPC; and (ii) claim-specific information that was missing and needed to be included on the no-fault bills.

88.     Unlike the Management Defendants, Headlam had essentially no involvement in operations of HMPC. Headlam did <u>not</u>: (i) control HMPC's finances; (ii) visit any of the Clinics where HMPC purportedly operated; (iii) actually meet or treat any of the Insureds; (iv) hire any staff for HMPC; (v) enter into lease agreements to rent space at Clinics where HMPC purportedly provided the Fraudulent Services; (vi) arrange for any funding agreements on HMPC's behalf; (vii) communicate with the FV Law Firm regarding HMPC's billing or finances; or (viii) sign any assignment of benefits ("AOB") forms, medical records, or ESWT reports that were included in the documentation supporting the bills submitted to GEICO.

### C.     The Unlawful financial and Kickback Arrangements

89.     In addition to the recruitment of Headlam and the unlicensed "technicians", the success of the Defendants' fraudulent scheme required the Management Defendants, with the assistance of the John Doe Defendants, to gain access to a large volume of Insureds on whom the unlicensed "technicians" could purport to provide the Fraudulent Services.

90.     However, HMPC was not set up to generate its own stand-alone patient base, as it did not have any fixed treatment locations, did not conduct any advertising or marketing, and had never previously provided ESWT. Instead, the Management Defendants obtained access to Insureds for HMPC and the unlicensed "technicians" through the payment of kickbacks or other

financial incentives to the owners/operators of the Clinics and/or to other individuals associated with the Clinics.

91.     In fact, the Management Defendants entered into unlawful referral agreements with the John Doe Defendants and controlled the fraudulent scheme by using the name of Headlam and HMPC on an itinerant basis in connection with the performance of the Fraudulent Services from more than forty (40) separate Clinics, primarily located in Brooklyn, Queens, and Bronx, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangement, including the following:

| Clinic - Street Address | Clinic – City/Borough | Clinic - Street Address | Clinic – City/Borough |
|---|---|---|---|
| 3250 Westchester Avenue | Bronx | 2386 Jerome Avenue | Bronx |
| 2488 Grand Concourse | Bronx | 240-19 Jamaica Avenue | Bellerose |
| 3910 Church Avenue | Brooklyn | 282 Avenue X | Brooklyn |
| 1735 Pitkin Avenue | Brooklyn | 332 East 149th Street | Bronx |
| 3041 Avenue U | Brooklyn | 358 Neptune Avenue | Brooklyn |
| 2673 Atlantic Avenue | Brooklyn | 625 East Fordham Avenue | Bronx |
| 1655 Richmond Avenue | Staten Island | 2016 Grand Avenue | Baldwin |
| 102-28 Jamaica Avenue | Jamaica | 4014 Boston Road | Bronx |
| 9016 Sutphin Boulevard | Jamaica | 430 West Merrick Road | Valley Stream |
| 548 Howard Avenue | Brooklyn | 2088 Flatbush Avenue | Brooklyn |
| 1611 East New York Avenue | Brooklyn | 62-69 99th Street | Rego Park |
| 4250 White Plains Road | Bronx | 97-14 Rockaway Boulevard | Ozone Park |
| 150 Graham Avenue | Brooklyn | 652 East Fordham Road | Bronx |
| 665 Pelham Parkway | Bronx | 1120 Morris Park Avenue | Bronx |
| 2184 Flatbush Avenue | Brooklyn | 1894 Eastchester Road | Bronx |
| 245 Rockaway Avenue | Valley Stream | 9801 Foster Avenue | Brooklyn |
| 1568 Ralph Avenue | Brooklyn | 599 Southern Boulevard | Bronx |
| 3000 Eastchester Road | Bronx | 611 East 76th Street | Brooklyn |
| 222-01 Hempstead Avenue | Jamaica | 2273 65th Street | Brooklyn |
| 3626 East Tremont Avenue | Bronx | 219-16 Linden Boulevard | Jamaica |
| 647 Bryant Avenue | Bronx | 79-45 Metropolitan Avenue | Flushing |
| 175 Fulton Avenue | Hempstead | 560 Prospect Avenue | Brooklyn |
| 488 Lafayette Avenue | Brooklyn | 55 East 115th Street | New York |
| 148-21 Jamaica Avenue | Jamaica | | |

92.    As a result of the unlawful financial and kickback arrangements between the Management Defendants and the John Doe Defendants that controlled the Clinics, the Defendants were provided with access to patients that treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

93.    The Clinics provided facilities for HMPC, and at the same time hosted a "revolving door" of other healthcare services providers, chiropractic providers, physical therapy providers, psychology providers, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

94.    In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

95.    At each of the Clinics, unlicensed laypersons, i.e., John Doe Defendants, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base. The Clinics willingly provided patient access to the Management Defendants in exchange for kickbacks and other financial incentives, because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and, therefore, catered to a high volume of Insureds at the locations.

96.    The Clinics were willing and able to provide HMPC (and other healthcare providers) with access to a large amount of Insureds in exchange for kickbacks or other financial incentives, because the John Doe Defendants who controlled the Clinics: (i) established and maintained multiple pipelines that funneled Insureds to their respective locations; and then (ii) entered into agreements with no-fault providers pursuant to which the Clinics provided access to their pools of Insureds in exchange for financial remuneration.

97.    In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent". These payments were, in reality, kickbacks for referrals, as the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinics' "representatives" to HPMC and the Management Defendants for the performance of the Fraudulent Services.

98.    To facilitate the kickback payments, which were in cash and typically disguised as "rent", the Defendants converted over $1 million paid by Financial Vision into cash through the Meladze Defendants' bank accounts.

99.    In keeping with the fact that the Clinics controlled the patient base, which was accessed through the payments, and that HMPC was one of several interchangeable "cogs" in an ongoing fraud wheel during the relevant time period, there were numerous instances where HMPC was: (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the Fraudulent Services on Insureds; and (ii) was one of numerous "providers" rendering the Fraudulent Services at specific Clinic locations in weekly sequences.

100.    The following are representative examples:

(i)      An Insured named AB was involved in an automobile accident and presented to the Church Ave Clinic. While treating at the Church Ave Clinic, AB purportedly received ESWT from Headlam through HMPC, and also purportedly received ESWT from: (i) Emmons Avenue Medical Office ("Emmons") by Oganesov; (ii) CVAP Medical PC ("CVAP") by Crystal Antoine-Pepeljugoski, M.D. ("Pepeljugoski"); (iii) Eric Kenworthy, M.D. ("Kenworthy"); (iv) Sergey Kalitenko; (v) Mark Vine M.D. ("Vine"); (vi) Grace Medical Health Provider, P.C. by Opeoluwa Eleyinafe, M.D. Eleyinafe; and (vii) MJG Medical Services by Max Jean-Gilles, M.D.;

(ii)     An Insured named EF was involved in an automobile accident and presented to the Clinic located at 647 Bryant Avenue, Bronx, New York (the "Bryant Ave Clinic"). While treating at the Bryant Ave Clinic, EF purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Emmons by Oganesov; (ii) CVAP by Pepeljugoski; (iii) Community Medical Care of NY, PC by Ahmad Riaz, M.D.; (iv) Healthwise Medical Associates, PC by Dominic Onyema, M.D.; and (v) Kenworthy;

(iii)    An Insured named AW was involved in a motor vehicle accident and presented to the 3000 Eastchester Road Clinic. While treating at the 3000 Eastchester Road Clinic, AW purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Elena Borisovna Stybel, M.D. ("Stybel"); and (ii) Vine;

(iv)     An Insured named MS was involved in a motor vehicle accident and presented to the Church Ave Clinic. While treating at the Church Ave Clinic, MS purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Kenworthy; and (ii) Vine;

(v)      An Insured named JR was involved in a motor vehicle accident and presented to the Bryant Ave Clinic. While treating at the Bryant Ave Clinic, JR purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Kenworthy; (ii) Vine; and (iii) Sangeet Khanna, M.D. ("Khanna");

(vi)     An Insured named IF was involved in a motor vehicle accident and presented to the Church Ave Clinic. While treating at the Church Ave Clinic, IF purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Kenworthy; and (ii) Vine;

(vii)    An Insured named AG was involved in a motor vehicle accident and presented to the 3000 Eastchester Road Clinic. While treating at the 3000 Eastchester Road Clinic, AG purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Stybel; and (ii) Vine;

(viii)   An Insured named BC was involved in a motor vehicle accident and presented to the Clinic located at 4250 White Plains Road, Bronx, New York (the "White Plains Road Clinic"). While treating at the White Plains Road Clinic, BC purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Stybel; and (ii) Vine;

(ix)    An Insured named ME was involved in a motor vehicle accident and presented to the Clinic located at 1655 Richmond Avenue, Staten Island, New York (the "Richmond Avenue Location"). While treating at the Richmond Avenue Location, ME purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Jean-Pierre Georges Barakat, M.D.; (ii) Kenworthy; and (iii) Lorraine Riotto, M.D.; and

(x)     An Insured named AR was involved in a motor vehicle accident and presented to the Clinic located at 3250 Westchester Avenue, Bronx, New York (the "Westchester Ave Clinic"). While treating at the Westchester Ave Clinic, AR purportedly received ESWT through HMPC by Headlam, and also purportedly received ESWT from: (i) Miklos Losonczy, M.D.; and (ii) Sherrie Rawlins, M.D.

101.    Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

102.    The unlawful kickback and referral arrangements were essential to the success of the fraudulent scheme. The Defendants derived significant financial benefit from the relationships with the Clinics because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other New York automobile insurers.

103.    The Defendants always knew that the kickbacks and referral arrangements were illegal and, therefore took affirmative steps to conceal the existence of the fraudulent referral scheme and the fraudulent billing.

104.    As a result of this arrangement, the Defendants subjected Insureds at the Clinics to the Fraudulent Services despite there being no clinical basis for the services, all solely to maximize profits without regard to genuine patient care.

**D.    Placing the Fraudulent Scheme Into Motion**

105.    To be able to submit the large amounts of billing for the Fraudulent Services to New York automobile insurers, including GEICO, the Management Defendants needed to – among other things – recruit "workers" who would purport to perform the Fraudulent Services.

106.    The Management Defendants recruited the unlicensed "technicians" to purport to perform the Fraudulent Services on behalf of HMPC at the Clinics, in exchange for nominal payment. Unlike the unlicensed "technicians", Headlam never visited any of the Clinics and never saw any of the patients who were purportedly treated by the HMPC.

107.    Once all of the necessary "pieces" were in place – i.e., the unlicensed "technicians" were hired, arrangements to have access to Clinics and patients, all the necessary information and signature from Headlam, and Headlam ceded control of HMPC to the Management Defendants – the fraudulent scheme was placed into overdrive. The Management Defendants and John Doe Defendants, working collaboratively with the unlicensed "technicians", Financial Vision, and the FV Law Firm, exercised complete control over all financial and operational aspects of HMPC.

108.    One aspect of the complete control over HMPC involved the generation of treatment records that would be used to submit bills to automobile insurers, including GEICO. This involved the Management Defendants arranging to have the unlicensed "technicians" go to the Clinics to generate the necessary ESWT treatment reports for the unlawfully referred Insureds. Also included in this aspect of the scheme was the Management Defendants and the John Doe Defendants using Headlam's license number, signature, and HMPC tax identification number to

fabricate the claim documents necessary to support the fraudulent claim submissions to GEICO and other New York automobile insurers, including assignment of benefits ("AOBs") forms and other medical records.

109.    Another aspect associated with controlling HMPC involved arranging to have the account receivables associated with the GEICO billings for the Fraudulent Services "funded" through the Financial Vision, with the assistance of the FV Law Firm.

110.    The FV Law Firm purported to represent Headlam and HMPC when, in reality, the FV Law Firm was actually "retained" by the Management Defendants. Once retained, the Management Defendants began to provide the FV Law Firm with the medical records, AOBs and claim-related documents for the Fraudulent Services that never were created or approved by Headlam.

111.    Using the fraudulent documents obtained from the Management Defendants, the FV Law Firm generated bills (i.e., NF-3 forms), as well as cover letters in their name that accompanied the bills and other fraudulent documents (i.e. medical records and AOBs) and mailed them to GEICO and other New York automobile insurers using the United States mails.

112.    Upon confirmation from the FV Law Firm of a list of bills that were submitted to automobile insurers, including GEICO, Financial Vision would issue "advances" purportedly to the HMPC, but in realty were mostly directed to the Meladze Defendants, which were then converted to cash and provided to the Management Defendants to directly profit from the fraudulent scheme and to fund its continued operation.

113.    Based upon the arrangement between the Management Defendants and Financial Vision, the Management Defendants were able to sell Financial Vision and HMPC's receivables and directly profit from the fraudulent scheme without being detected or creating any risk.

114.    For example, Financial Vision, through the FV Law Firm, made the following payments to the Meladze Defendants as purported "advances" to HMPC:

| Advance Date | Receiver | Advance Amount |
|---|---|---|
| October 26, 2021 | Sunstone Services | $87,166.50 |
| November 5, 2021 | Blue Tech Supplies | $76,053.79 |
| November 8, 2021 | Blue Tech Supplies | $150,639.88 |
| November 9, 2021 | Sunstone Services | $154,099.79 |
| November 12, 2021 | Sunstone Services | $280,000.00 |
| November 12, 2021 | Blue Tech Supplies | $273,966.59 |
| | **TOTAL = $1,021,926.55** | |

115.    The FV Law Firm, at the direction of the Management Defendants, not Headlam, sent the funding advances to the Meladze Defendants so that the money would be able to be converted into untraceable cash and paid over to them.

116.    As part of the arrangement between the Management Defendants and Financial Vision, Financial Vision would be paid from the FV Law Firm once payments were received from insurance companies on the claims for Fraudulent Services.

117.    The FV Law Firm would deposit the money obtained from insurers on behalf of HMPC into their Attorney/IOLA Account, and then issue payments to Financial Vision.

118.    As a result of those efforts, the Management Defendants received hundreds of thousands in advances on the claims for the Fraudulent Services from the Financial Vision without any risk, because they were never signatories to the agreements.

### E.    Defendants' Fraudulent Billing and Treatment Protocols

119.    The Fraudulent Services billed in the name of HMPC were not medically necessary and were provided - to the extent they were provided at all - pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds. The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

120.    Neither Headlam nor any other licensed physician was ever involved in the performance of the Fraudulent Services. Unlicensed laypersons rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics. Once they were given access, the Management Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled, despite there being no clinical basis for the services, and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

121.    The only point in having the Insureds seen by the unlicensed technicians was to get the Insureds' signatures on a piece of paper so that the Management Defendants could generate bills in the name of HMPC to submit to GEICO and other New York automobile insurers for reimbursement.

122.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

123. No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

124. Through the fraudulent scheme, HMPC was used to bill GEICO and other automobile insurers millions of dollars for the performance of the Fraudulent Services in a "quick hit" style, using HMPC along with other entities only for a matter of a couple of months, thereby attempting to limit the insurance companies' ability to investigate and address the fraudulent scheme.

125. The Management Defendants had unlicensed technicians purportedly subject Insureds to medically unnecessary, ESWT "treatments". In keeping with the fact that the Management Defendants intended to conceal the absence of involvement by any physician, the Management Defendants arranged to have the services documented on a generic "form" that simply printed "Headlam Medical Professional Corporation, P.C.", and listed the South Service Road Location on the top of the form, and Headlam's photocopied signature on the bottom.

126. The following are representative examples:

Headlam Medical Professional Corporation
68 S SERVICE RD STE 100
MELVILLE, NY 11747

PATIENT: ▮▮▮▮▮▮▮▮    LAST NAME: ▮▮▮▮▮▮▮▮

D.O.B.: ▮▮▮▮▮▮

D.O.S. 9/24/21

LOCATION: 1655 Richmond ave

### Extracorporeal Shock Wave & RPW Treatment

Procedure #: ___1___ ✓2 ___3___ ___4___ ___5___

☐ lumbar
☐ thoracic
☐ rt shoulder
☐ _____

DX Codes
☐ M54.2 Cervicalgia
☑ M54.6 Pain in Thoracic
☑ M54.5 Low Back Pain
☐ M54.41 Lumbago with Sciatica R side
☐ M54.42 Lumbago with Sciatica L side
☐ M25.561 Pain in right knee joint
☐ M25.562 Pain in left knee joint
☑ M25.511 Pain in right shoulder
☐ M25.512 Pain in left shoulder
☐ M79.604 Pain in right leg
☑ M79.605 Pain in left leg
OTHER _____

---

Headlam Medical Professional Corporation
68 S SERVICE RD STE 100
MELVILLE, NY 11747

RADIAL PRESSURE WAVE THERAPY REPORT

RPW Consult/Treatment Form
S: Pt is a 31 y/o M who sustained injuries in an accident on 8/25/21
O: Tenderness to palpation and/or decreased ROM

☑ Cervical          ☐ L Shoulder
☑ Thoracic          ☐ R Knee
☑ Lumbar            ☐ L Knee
☐ R Shoulder        ☐ Other _____

TREATMENT GOALS
☑ Improve Mobility and ROM      ☑ Decrease Inflammation
☐ Improve Function/Activity Tolerance    ☑ Decrease Pain
☐ Increase General Fitness/Endurance    ☐ Decrease Stiffness
☐ Break Up Soft Tissue Adhesions    ☐ Other _____

Frequency:
✓ 0-1 times ___1-2 times ___2-3 times ___3-4 times ___4-5 times    a week
Parameters (technician use):
Pressure Intensity  60  BAR (1.0 to 16)
Pulses  1500  (500 to 3000)
Frequency  7  Hz (1 to 16)
Type of Transmitter ____(Red R40) ____(Black D20) ____(Other)

*Bo Headlam*

Bo Headlam, MD
License# 286498

Date: 9/24/21

---

127.    Of consequence, the claims submitted to GEICO in the name of HMPC included an NF-3 form falsely representing that Headlam performed ESWT "treatments" and included "reports" and "notes" associated with the ESWT "treatments" that did not identify who actually performed the service.

128.    The billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols. According to the billing, the ESWT "treatment" alleged to have been performed on Insureds through HMPC purported that, in only approximately twenty-three (23) separate dates of service: (i) ESWT was performed on more than 440 separate patients; (ii) ESWT was performed at over forty (40) separate locations; and (iii) HMPC provided ESWT at multiple locations at the same day, with multiple instances, including 10 or more separate treatment locations on some days.

35

129.    Once documented by the unidentified service provider, HMPC was used to bill GEICO for reimbursement for the ESWT using CPT code 0101T.

**CATEGORY III CODES**                                              **0042T–0504T**
**Medical Fee Schedule**                                          **Effective April 1, 2019**

| | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|
| ■ | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric measures with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| ■ | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified; high energy | 2.78 | XXX | |

130.    As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.

131.    Additionally, and as noted in the Fee Schedule, the CPT code: (i) is scheduled to be paid using the conversion rate for surgical services; and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

132.    Furthermore, the ESWT allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons.

133.    In the first instance, the charges were fraudulent in that the unlicensed technicians controlled by the Management Defendants did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T.

134.    Rather, HMPC and the Management Defendants arranged to have unlicensed technicians perform Radial Pressure Wave Therapy on the Insureds. Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave. Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.

135.    Secondly, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain; and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and, therefore, not covered.

136.    Notwithstanding the experimental nature, HMPC and the Management Defendants purportedly provided ESWT as part of a predetermined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation. In furtherance of that, HMPC and the Management Defendants typically submitted a boilerplate, checklist treatment report containing a stamped signature, not an actual signature, and the ESWT

was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

137.    For example, HMPC typically rendered ESWT to Insureds less than twenty (20) days after the accidents, including the following examples:

(i)      HMPC purported to provide ESWT to an Insured named OP on September 3, 2021, only 5 days after the Insured's accident on August 29, 2021.

(ii)     HMPC purported to provide ESWT to an Insured named KR on September 7, 2021, only 3 days after the Insured's accident on September 4, 2021.

(iii)    HMPC purported to provide ESWT to an Insured named RS on September 9, 2021, only 4 days after the Insured's accident on September 5, 2021.

(iv)     HMPC purported to provide ESWT to an Insured named TM on September 16, 2021, only 4 days after the Insured's accident on September 12, 2021.

(v)      HMPC purported to provide ESWT to an Insured named SJ on September 17, 2021, only 4 days after the Insured's accident on September 13, 2021.

(vi)     HMPC purported to provide ESWT to an Insured named DA on September 30, 2021, only 5 days after the Insured's accident on September 25, 2021.

(vii)    HMPC purported to provide ESWT to an Insured named DD on September 30, 2021, only 5 days after the Insured's accident on September 25, 2021.

(viii)   HMPC purported to provide ESWT to an Insured named KO on September 30, 2021, only 7 days after the Insured's accident on September 23, 2021.

(ix)     HMPC purported to provide ESWT to an Insured named SG on October 13, 2021, only 4 days after the Insured's accident on October 9, 2021.

(x)      HMPC purported to provide ESWT to an Insured named JT on October 28, 2021, only 6 days after the Insured's accident on October 22, 2021.

These are only representative examples.

138.    Additionally, HMPC falsely claimed to have routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics:

(i)      On February 23, 2021, three Insureds – JC, CL, and KP – were involved in the same automobile accident. Thereafter, JC, CL, and KP all presented to

the same Clinic located at 150 Graham Avenue, Brooklyn, New York, and each purportedly received ESWT "treatments" through HMPC.

(ii)    On April 29, 2021, two Insureds – KC and TW – were involved in the same automobile accident. Thereafter, KC and TW both presented to the Clinic located at 9016 Sutphin Boulevard, Jamaica, New York, and both purportedly received ESWT "treatments" through HMPC.

(iii)    On May 7, 2021, two Insureds – KF and MR – were involved in the same automobile accident. Thereafter, KF and MR both presented to the Clinic located at 3910 Church Avenue, Brooklyn, New York (the "Church Ave Clinic"), and both purportedly received ESWT "treatments" through HMPC.

(iv)    On June 23, 2021, two Insureds – LG and JT – were involved in the same automobile accident. Thereafter, LG and JT both presented to the Clinic located at 665 Pelham Parkway, Bronx, New York, and both purportedly received ESWT "treatments" through HMPC.

(v)    On June 26, 2021, two Insureds – SH and JR – were involved in the same automobile accident. Thereafter, SH and JR both presented to the 3000 Eastchester Road Clinic, and both purportedly received ESWT "treatments" through HMPC.

(vi)    On July 4, 2021, three Insureds – AJ, CJ, and SJ – were involved in the same automobile accident. Thereafter, AJ, CJ, and SJ all presented to the Clinic located at 102-28 Jamaica Avenue, Jamaica, New York, and each purportedly received ESWT "treatments" through HMPC.

(vii)    On July 5, 2021, two Insureds – ME and NR – were involved in the same automobile accident. Thereafter, ME and NR both presented to the Clinic located at 1655 Richmond Avenue, Staten Island, New York, and both purportedly received ESWT "treatments" through HMPC.

(viii)    On July 11, 2021, two Insureds – KB and FO – were involved in the same automobile accident. Thereafter, KB and FO both presented to the Clinic located at 1894 Eastchester Road, Bronx, New York, and both purportedly received ESWT "treatments" through HMPC.

(ix)    On July 17, 2021, two Insureds – BC and JC – were involved in the same automobile accident. Thereafter, BC and JC both presented to the Clinic located at 4250 White Plains Road, Bronx, New York, and both purportedly received ESWT "treatments" through HMPC.

(x)    On August 13, 2021, two Insureds – BB and TC – were involved in the same automobile accident. Thereafter, BB and TC both presented to the Clinic

located at 219-16 Linden Boulevard, Jamaica, New York, and both purportedly received ESWT "treatments" through HMPC.

(xi)   On August 15, 2021, two Insureds – TB and AH – were involved in the same automobile accident. Thereafter, TB and AH both presented to the Clinic located at 222-01 Hempstead Avenue, Jamaica, New York, and both purportedly received ESWT "treatment" through HMPC.

(xii)   On August 20, 2021, two Insureds – JE and JN – were involved in the same automobile accident. Thereafter, JE and JN both presented to the Clinic located at 2673 Atlantic Avenue, Bronx, New York, and both purportedly received ESWT "treatment" through HMPC.

(xiii)   On August 26, 2021, two Insureds – XR and BV – were involved in the same automobile accident. Thereafter XR and BV both presented to the Clinic located at 599 Southern Boulevard, Bronx, New York, and both purportedly received ESWT "treatment" through HMPC.

(xiv)   On August 29, 2021, two Insureds – MM and RW – were involved in the same automobile accident. Thereafter, MM and RW both presented to the Clinic located at 3250 Westchester Avenue, Bronx, New York, and both purportedly received ESWT "treatments" through HMPC.

(xv)   On August 31, 2021, two Insureds – SJ and MS – were involved in the same automobile accident. Thereafter, SJ and MS both presented to the Clinic located at 22-73 65th Street, Brooklyn, New York, and both purportedly received ESWT "treatments" through HMPC.

These are only representative examples.

139.   In all of the claims identified in Exhibit "1", Defendants falsely represented that the ESWT were medically necessary, when, in fact, they were not medically necessary for each Insured and provided pursuant to predetermined fraudulent protocols and were, therefore, not eligible to collect No-Fault Benefits in the first instance.

140.   In addition, the charges were also fraudulent, because the bills misrepresented the amounts collectible for each date of service. More specifically, CPT Code 0101T only contemplates the billing for the code once per date of service. The code specifically describes the

service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

141.    Notwithstanding the clear language of the code, the bills submitted in the name of HMPC fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) for each section of the Insured's body to which the ESWT was performed.

142.    The following is a representative sample:

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 09/24/2021 | 1655 Richmond Ave, Staten Island, NY, 10314 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE THORACIC AREA | 1 | 0101T | $ 700.39 |
| 09/24/2021 | 1655 Richmond Ave, Staten Island, NY, 10314 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LUMBAR AREA | 1 | 0101T | $ 700.39 |
| 09/24/2021 | 1655 Richmond Ave, Staten Island, NY, 10314 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE CERVICAL AREA | 1 | 0101T | $ 700.39 |

TOTAL CHARGES TO DATE $ 2101.17

143.    In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by two (2) or three (3) times for each date of services.

144.    In all of the claims identified in Exhibit "1", the Defendants falsely represented that the ESWT charges were medically necessary, were performed by Headlam, and were appropriately charged, when, in fact, they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols, were inappropriately unbundled, and were, therefore, not eligible to collect No-Fault Benefits in the first instance.

F.     The Fraudulent Billing for Independent Contractor Services

145.    The Defendants' fraudulent scheme also included the submission of claims to GEICO in the name of HMPC seeking payment for services provided by individuals that it never employed.

146.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors. The healthcare services must be provided by the billing provider itself, or by its employees.

147.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

148.    During the relevant time period, hundreds of individual bills were submitted to GEICO using the United States mails seeking payment for the Fraudulent Services performed by

42

individuals other than Headlam but billed in the name of HMPC, while falsely representing in virtually all the bills that Headlam was the actual provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation were made regarding who performed the services and their relationship to the billing provider, which was being unlawfully operated and controlled by the Management Defendants.

149.     In fact, virtually all of the NF-3 forms submitted to GEICO contained the following representation:

| 16   IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| Headlam, Bo | M.D. | 286498 | EMPLOYEE<br>· | INDEPENDENT CONTRACTOR<br>☐ | OTHER (SPECIFY)<br>Owner |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary)

Bo Headlam, LIC# 286498

| 18   IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? | YES | ✓ | NO | |
|---|---|---|---|---|

19   ESTIMATED  DURATION OF FUTURE TREATMENT
UNDETERMINED

150.     The statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians and/or individuals who performed the Fraudulent Services were never: (i) employed by Headlam or HMPC; (ii) under Headlam's direction and/or control; or (iii) paid by HMPC.

151.     The individuals who performed the Fraudulent Services were also simultaneously performing virtually identical services for other fraudulent "providers" that were operated and controlled by the Management Defendants and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

152. By way of illustration, the great majority of the Insureds identified in Exhibit "1" received ESWT from various providers over a period of weeks or months, including HMPC, at a single Clinic, as previously noted.

153. Any individual alleged to have performed the Fraudulent Services could not have legitimately been employed by HPMC for among other reasons, they were simultaneously providing healthcare services for multiple "providers" (sometimes as many as five at the same time) at the same location and/or at different locations when they purported to provide services for HMPC.

154. Because the Fraudulent Services were performed, to the extent they were provided at all, by individuals not employed by Headlam and/or HMPC, the Defendants never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this Complaint.

155. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay for the Fraudulent Services when, in fact, GEICO was not obligated to pay for the Fraudulent Services.

III. **The Fraudulent Billing That Defendants Submitted or Caused to be Submitted to GEICO**

156. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, AOBs and medical reports/records using the name of HMPC and its tax identification number and seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

157.    The NF-3 forms, reports, AOBs and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants virtually always misrepresented that Headlam had performed the Fraudulent Services and that Headlam's name, license and the tax identification numbers of HMPC was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the Management Defendants unlawfully and secretly controlled, and operated HMPC;

(ii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided;

(iii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided, to the extent provided at all, pursuant to unlawful kickback and referral arrangements;

(iv)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and

(v)    The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided – to the extent provided at all – by unlicensed individuals not employed by Headlam or HMPC.

## IV.    **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

158.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

159.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

160.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Headlam in the performance of the Fraudulent Services and Headlam's ownership, control and/or management of HMPC. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that HMPC and the Management Defendants unlawfully exchanged kickbacks for patient referrals.

161.    Furthermore, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.  In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals that were employed by Headlam and HMPC.

162.    GEICO takes steps to timely respond to all claims and to ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon

them. As a result, GEICO incurred damages of more than $1 million based upon the fraudulent charges.

163.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against All Defendants**
**(Common Law Fraud)**

164.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

165.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

166.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Headlam had performed the ESWT and that their name, medical license, and the tax identification numbers of HMPC and Headlam were being legitimately used to bill for the ESWT, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when, in fact, Headlam never performed any of the services and that the Defendants unlawfully and secretly owned, controlled, operated, and managed HMPC; (ii) the representation that the billed-for services had been rendered and were reimbursable, when, in fact, the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed-for services were eligible for reimbursement, when, in fact, the services were provided, to the extent provided at all, pursuant to unlawful kickback and referral arrangements between Defendants and

the Clinics; (iv) the representation that the billed-for services were medically necessary when they were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed-for services were eligible for payment because the services were provided by Headlam, when, in fact, the services were provided by unlicensed or other individuals that were never supervised by Headlam or employed by HMPC.

167.    The Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through HMPC that were not compensable under New York no-fault insurance laws.

168.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,042,000.00 pursuant to the fraudulent bills submitted by the Defendants through HMPC.

169.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

170.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**Against All Defendants**
**(Unjust Enrichment)**

171.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

172.    As set forth above, the Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

173.    When GEICO paid the bills and charges submitted by or on behalf of HMPC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

174.    The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

175.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

176.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,042,000.00.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against the Defendants**
**(Conspiracy to Commit Fraud)**

177.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

178.    The Defendants participated in a scheme to defraud GEICO as described above.

179.    The Defendants had actual knowledge that the other Defendants in this action were committing fraud against GEICO.

180.    The Defendants provided substantial assistance to one another to perpetuate the scheme to defraud described above by partnering with one another to: (i) use the  name, professional license, personal information and signature of Headlam, as well as the tax identification number of HMPC, to perpetuate a fraudulent scheme; (ii) illegally operate and

control HMPC and its assets for their own financial benefit; (iii) generate false and fraudulent billing and supporting documents and submitting them to GEICO through HMPC; (iv) engage in unlawful kickback arrangements to gain patient access and arrange to have independent contractors perform services pursuant to those illegal arrangements; (v) arrange for "funding" agreements between the Financial Vision and HMPC; (vi) arrange for the FV Law Firm to represent Headlam and HMPC in regard to the submission of billing and collection, as needed, on the fraudulent claims submitted to GEICO; (vii) arrange to launder the "advances" to fund the unlawful kickback arrangements and for their own financial benefit; (viii) conceal payments from the "advances" to one another and to the Clinics and their operators/managers to gain access to Insureds for purpose of providing the Fraudulent Services; and (ix) arrange to launder the insurance proceeds through the IOLA/Trust Accounts of the FV Law Firm for purposes of distributing the insurance payments to themselves and to Financial Vision.

181.    The conspiratorial conduct of the Defendants to commit fraud against GEICO and the New York automobile insurance industry caused GEICO to pay more than $1,042,000.00 pursuant to the fraudulent bills submitted to GEICO through HMPC.

182.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

183.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages against the Defendants, together with interest and costs, and any other relief the Court deems just and proper.

## **JURY DEMAND**

184.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,042,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

B.      On the Second Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,042,000.00 together with costs, interest, and such other and further relief as the Court deems just and proper; and

C.      On the Third Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,042,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

Dated: August 26, 2024

RIVKIN RADLER LLP

By: _/s/ Barry I. Levy_

Barry I. Levy, Esq.
Michael Vanunu, Esq.
Alexandra Wolff, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*